

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed August 23, 2012**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| 1701 COMMERCE, LLC, | § | |
| | § | |
| DEBTOR. | § | CASE NO. 12-41748 (DML) |
| | § | |

### MEMORANDUM OPINION AND ORDER

Before the court is the *Motion for Dismissal Pursuant to § 1112(b)(4)* (the "Motion to Dismiss") and the *Motion for Relief of the Automatic Stay Pursuant to § 362(d)* (the "Motion for Relief" and, with the Motion to Dismiss, the "Motions") filed by Dougherty Funding, LLC. ("Dougherty"). The court conducted a hearing (the "Hearing") respecting the Motions over a period of four days.[1] During the Hearing, the court heard testimony from Craig Burr ("Burr"), senior vice president of 1701 Commerce, LLC

---
[1] May 8, 9, 21 and 29, 2012.

("Debtor"), and John Lewis Greisen ("Greisen"), senior vice president of Dougherty. The court also received into evidence exhibits identified as necessary below.

This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334; 157(b)(2)(A) and (G). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052; 9014.

### I.     Background

In 2007, Dougherty agreed to make a $39.6 million[2] loan (the "Senior Loan") to non-party Presidio Hotel Forth Worth, L.P. ("Borrower") to purchase and rehabilitate the property at 1701 Commerce Street, Fort Worth, Texas 76102, commonly known as the Sheraton Fort Worth Hotel and Spa (the "Property"). The Senior Loan was secured by a first mortgage on the Property. The balance now due on the Senior Loan is approximately $44.5 million. *See* Ex. 2;[3] Transcript ("TR"), May 21, 2012 at 43 (Testimony ("TM") of Greisen).

After entering into the Senior Loan, Borrower needed further funds to complete refurbishing of the Property and so entered into an additional loan (the "Junior Loan") with Vestin Originations, Inc. ("Vestin"), Debtor's affiliate, for approximately $10 million in subordinated financing. *See* Ex. 11. Vestin took a second lien on the Property to secure the Junior Loan and assigned the Junior Loan and related security documents to three of its affiliates[4] (the "Vestin Affiliates"), in early May 2008.[5] *See* Ex. 12.

---

[2]  There is some conflict in the record regarding whether the principal owed on the Senior Loan is $38.975 million or $39.6 million. Regardless of which figure is correct, the court's ruling on the present motion would be the same.

[3]  Numbered exhibits, unless otherwise identified, are exhibits submitted by Dougherty. Exhibits identified by letter are exhibits submitted by Debtor. Exhibits which were attached to Dougherty's Motions are identified as such, and by letter.

[4]  Vestin Realty Mortgage I, Inc., Vestin Realty Mortgage II, Inc. and Vestin Fund III, LLC.

The Property has also received financial support and a commitment to Borrower for future financial support in the form of a twenty year tax agreement with the City of Fort Worth (the "City").[6] *See* Ex. 26 (the "Tax Incentive Agreement"). Since 2011, the Property has been operated by Richfield Hospitality, Inc. ("Richfield"), a professional hotel management company. Richfield operates the Property pursuant to a contract between it and Borrower. *See* Ex. X to Dougherty's Motions.

When Borrower obtained the Junior Loan in May 2008, Dougherty and Vestin[7] entered into a Subordination and Intercreditor Agreement (the "Intercreditor Agreement"), which established the rights of the respective secured creditors in the Property, including the circumstances under which each might foreclose. *See* Ex. 1.

During 2011, Borrower reported to Dougherty and the Vestin Affiliates that it would have difficulty meeting its debt obligations. Debtor, a wholly-owned subsidiary of Vestin, was created as a special purpose vehicle to take the place of the Vestin Affiliates respecting the Property, thus limiting the potential exposure of other assets of the Vestin Affiliates in the future. *See* TR, May 8, 2012 at 69-70 (TM of Burr). On or about November 30, 2011, the Vestin Affiliates purported to assign their interests pertaining to the Junior Loan to Debtor, pursuant to an assignment of deed of trust. *See* Ex. 14.

---

[5] Vestin assigned its deed of trust for the Property to the Vestin Affiliates on May 6, 2008.

[6] Under the Tax Incentive Agreement, the City makes annual grant payments to Developer (as defined within the Tax Incentive Agreement), calculated based on multiple factors, including the hotel occupancy tax revenue produced by Developer in the prior year, local spending, local jobs, and other factors. Tax Incentive Agreement § 6.

[7] It is not clear whether the Vestin Affiliates participated in this transaction, or in the Intercreditor Agreement, but the parties do not dispute that the Vestin Affiliates are bound by the Intercreditor Agreement.

Dougherty asserts that this assignment violates sections 25 and 30(i) of the Intercreditor Agreement.[8]

In December 2011, Borrower defaulted on both the Senior Loan and Junior Loan. On December 19, 2011, Dougherty sent Borrower a letter notifying it of defaults. *See* Ex. 15. On January 4, 2012, Debtor, as successor in interest to the Vestin Affiliates, also sent Borrower a letter notifying it of defaults. *See* Ex. M to Dougherty's Motions. On January 17, 2012, Debtor posted the Property for a February 7, 2012 foreclosure sale. *See* Ex. N to Dougherty's Motions.

This foreclosure sale never occurred. On February 3, 2012, Dougherty and Borrower filed suit in the 141st Judicial District Court of Tarrant County, Texas,[9] in which they unsuccessfully sought to restrain Debtor from foreclosing on the Property. On February 7, 2012, the day scheduled for the foreclosure, Borrower transferred title to the Property to Debtor via a deed-in-lieu of foreclosure (the "Deed-in-Lieu Agreement"). *See* Ex. 17. In exchange for executing the Deed-In-Lieu Agreement, Borrower, and, in their capacity as guarantors of the Junior Loan, Borrower's principals, received a complete release from Debtor of all claims and obligations arising from the Junior Loan, conditioned only on the Deed-In-Lieu Agreement not being subsequently overturned by judicial decision. *Id*. § 3.

---

[8] Section 25 provides: "Subordinated Lender [Vestin on the date of execution, but later the Vestin Affiliates, by assignment] represents and warrants to Senior Lender that . . . it has not made or permitted any assignment or transfer, as security or otherwise, of the [Junior Loan], of any instrument evidencing the [Junior Loan], or of any of its collateral, and it shall not do so long as this Agreement remains in effect …." *See* Ex. 1. Section 30(i) states: "Subordinated Lender shall not assign or transfer all or any portion of its rights or responsibilities under this Agreement, including any instrument relating to the Subordinated Loan, the Property or any other property securing the Subordinated Loan." *Id*.

[9] Cause No. 141-257733-12.

Dougherty then posted the Property for a March foreclosure. *See* Exs. 19-20. Dougherty allegedly did so before February 10, 2012, the day it learned about Borrower's transfer of the Property to Debtor. *See* Ex. 18.

The parties raised a dispute over the terms of Intercreditor Agreement in state court when Debtor obtained a temporary restraining order (the "TRO") prohibiting Dougherty from foreclosing on the Property. *See* Ex. R to Dougherty's Motions. Vestin and Debtor assert that the Intercreditor Agreement prohibited Dougherty from interfering with Debtor's acquisition of the Property by the Deed-in-Lieu Agreement. Dougherty asserts that the Intercreditor Agreement prohibited Debtor from acquiring the Property through the Deed-in-Lieu Agreement.[10]

On March 26, 2012—the evening immediately prior to the evidentiary hearing respecting dissolution or continuation of the restraints provided by the TRO—Debtor filed for relief under chapter 11 of the Bankruptcy Code (the "Code")[11] in this court, thus frustrating Dougherty's plan to proceed in state court and Dougherty's planned foreclosure of the Property.

Following Debtor's commencement of this chapter 11 case, Debtor filed a plan of reorganization and accompanying disclosure statement. Debtor was not a party to the agreements between Borrower and, *inter alia*, the City, Borrower's franchisor (Sheraton), and Richfield, but Debtor has taken steps to assume Borrower's position vis-à-vis those

---

[10] The language of the Intercreditor Agreement appears to support Dougherty's interpretation, but as discussed below, the court need not at this juncture become an alternative venue for a state law dispute between the creditors in this case.

[11] 11 U.S.C. §§ 101 *et seq.*

entities. The hearing on Debtor's disclosure statement is presently set for August 24, 2012.[12]

## II. Discussion

Dougherty argues that Debtor filed this bankruptcy in bad faith, and thus (1) Dougherty should be granted relief from the automatic stay of Code § 362(a) pursuant to § 362(d), or (2) the case should be dismissed pursuant to Code § 1112(b).

Subsection (d) of section 362 provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest[, or ] (2) with respect to a stay of an act against property under subsection (a) of this section, if— (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization . . . ."

Section 1112(b)(1) provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause" if one or more of the nonexclusive conditions listed in section 1112(b)(4) are met.[13]

---

[12] Debtor also intends to seek an extension of the exclusivity periods specified in Code § 1121.

[13] These conditions include:

"**(A)** substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

**(B)** gross mismanagement of the estate;

**(C)** failure to maintain appropriate insurance that poses a risk to the estate or to the public;

**(D)** unauthorized use of cash collateral substantially harmful to 1 or more creditors;

**(E)** failure to comply with an order of the court;

**A. Relief Under § 362(d)(2) Relating to Real Property**

Section 362(d)(2) provides for relief from the automatic stay with respect to property where the debtor has no equity in the property and where the property is not necessary for an effective reorganization. Although the parties have obtained differing appraisals of the Property,[14] there is no dispute that the current value of the Property is in excess of Dougherty's secured claims. There is, however, a question as to whether the value of the Property exceeds the combined amount of the Senior Loan and the Junior Loan. Because Vestin Entities transferred the Junior Loan to Debtor, the Junior Loan

---

**(F)** unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

**(G)** failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

**(H)** failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

**(I)** failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

**(J)** failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

**(K)** failure to pay any fees or charges required under chapter 123 of title 28;

**(L)** revocation of an order of confirmation under section 1144;

**(M)** inability to effectuate substantial consummation of a confirmed plan;

**(N)** material default by the debtor with respect to a confirmed plan;

**(O)** termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

**(P)** failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition."

Code § 1121(b)(4).

[14] Dougherty obtained an appraisal of the Property reflecting a value of $65.6 million as of September 1, 2011 (the "September Appraisal"). However, an appraisal obtained by Vestin in March 2012 (the "March Appraisal") indicated that the value of the Property as of March 27, 2012 was $55 million.

was extinguished through merger with the ownership upon transfer of the Property to Debtor by the terms of the Deed-In-Lieu Agreement. As such, because there is equity in the Property beyond the debt to Dougherty, and alternatively because it is essential to Debtor's reorganization, relief from the automatic stay is not appropriate under section 362(d)(2).[15]

### B. Cause for Relief Under § 362(d)(1) and for Dismissal Under § 1112(b)

Dougherty argues Debtor commenced this Chapter 11 case in bad faith, and therefore that cause exists to either grant relief from the automatic stay or dismiss the case. While the Code does not expressly list filing in bad faith as cause for relief or dismissal,[16] the Code's definition of "cause" is not exhaustive, and courts in this and other circuits have long recognized that bad faith constitutes "cause" for purposes of dismissal under section 1112(b) or relief from stay under section 362(d)(1). *Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*, 936 F.2d 814, 816-17 (5th Cir. 1991); *Little Creek Dev. Co. v. Commonwealth Mortg. Co. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1071-72 (5th Cir. 1986); *Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. P'ship)*, 52 F.3d 127, 130-31 (6th Cir. 1995).[17]

---

[15] Dougherty's equity cushion is also sufficient at this time to adequately protect Dougherty. *See, e.g.*, *In re Kleibrink*, 346 B.R. 734, 760 (Bankr. N.D. Tex. 2006) ("For purposes of determining whether a secured creditor's interest is adequately protected, courts must analyze the property's equity cushion, which is the value of the property after deducting the claim of the creditor seeking relief from the stay and all senior liens.").

[16] *See supra* note 13 and accompanying text.

[17] Debtor cites *In re 1020 Warburton Ave. Realty Corp.*, 127 B.R. 333, 335 (Bankr. S.D.N.Y. 1991) for the proposition that bad faith requires subjective bad faith. Whatever the merits of this argument in the Southern District of New York, it is not the law of this Circuit. In *Humble Place*, 936 F.2d at 817, the Fifth Circuit affirmed a dismissal for bad faith after observing that the bankruptcy court did not make a finding of subjective bad faith. *Accord Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) (holding that subjective intent is not determinative of good faith filing).

Courts have identified a number of factors indicative of a bad faith filing, including:

(1) the debtor has one asset, such as either undeveloped or developed real property, encumbered by secured creditors' liens,

(2) debtor has engaged in improper pre-petition conduct,

(3) the debtor's property has been posted for foreclosure, and the debtor has tried unsuccessfully to prevent this foreclosure in state court,

(4) the filing of bankruptcy enabled the debtor to evade court orders,

(5) the debtor employs few or zero employees other than its principals,

(6) there is little or no cash flow or source of income to sustain a reorganization, and

(7) there are few if any unsecured creditors and their claims are relatively small.

*Little Creek*, 779 F.2d at 1072-73; *Trident*, 52 F.3d at 131.[18]

Many of these factors are present here.  Debtor holds a single asset;  the Property.  Debtor does not have employees; rather, those individuals employed at the Property work for Richfield.  *See* TR, May 21, 2012 at 134 (TM of Burr).  To the extent that Debtor's existence enables Richfield to employ approximately 160 people, it was Debtor's filing of bankruptcy that jeopardized those jobs.  *See* Ex. 54.  There appears to have been improper pre-petition conduct on the part of the Vestin Affiliates with regard to the creation of Debtor and observance by Debtor and the Vestin Affiliates of the requirements of the Intercreditor Agreement.  The Property had been posted for foreclosure, and Debtor filed bankruptcy on the eve of a hearing at which the TRO

---

[18]   Not all of these factors need to be present for bad faith to exist. *Little Creek*, 779 F.2d at 1072-73.

barring foreclosure might have been dissolved. The bulk (if not all) of the unsecured claims Debtor has scheduled are in fact debts owed by Richfield.

Furthermore, where, as here, "a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors," the inference of bad faith is particularly strong.[19] *Little Creek*, 779 F.2d at 1073; *accord Trident*, 52 F.3d at 131-32. The court infers that the primary purpose of placing the Property in Debtor was to isolate the Property and the problems associated with it from the other assets of Vestin and the Vestin Affiliates. *See In re Thirtieth Place, Inc.*, 30 B.R. 503, 505-06 (B.A.P. 9th Cir. 1983) (finding "persuasive evidence of bad faith" where debtor was "created for the sole purpose of obtaining protection under the automatic stay by filing bankruptcy").

The Fifth Circuit has also made clear that the bankruptcy court should not retain a case to become a venue for the resolution of a state court dispute. *Humble Place*, 936 F.2d at 818 ("These disputes were fully capable of resolution in state court without the delay and expense caused by bankruptcy."); *see also Little Creek*, 779 F.2d at 1074. In the case at bar, this court is asked to resolve what is really a one-on-one dispute between Dougherty and Vestin. Debtor is a special purpose vehicle that is no more than an appendage of Vestin. This case is in fact an inter-lender dispute in which the two lenders are the two principal parties *with actual stakes* in the outcome of the dispute.[20]

---

[19] Courts refer to this scenario as "new debtor syndrome." *Little Creek*, 779 F.2d at 1073; *Trident*, 52 F.3d at 131-32.

[20] Similar inter-lender and two-party disputes have been dismissed for cause because of such bad faith. *E.g.*, *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718 (Bankr. N.D. Ill. 1996) (dismissing for bad faith junior creditors' attempt to use bankruptcy to halt lender's foreclosure action); *N. Cent. Dev. Co. v. Landmark Capital Co. (In re Landmark Capital Co.)*, 27 B.R. 273 (Bankr. D. Ariz. 1983) (dismissing for bad faith where the facts disclose only a two-party dispute).

For the above reasons, the court concludes that Debtor filed its chapter 11 petition in bad faith. While this would in most cases warrant granting one of the Motions, the court recognizes that in the case before it, the Property has significance for other parties whose interests deserve deference from the court.[21] As with any chapter 11 case, the court must consider the legitimate interests of others in deciding whether to grant either of the Motions. *See In re Mirant Corp.*, 378 F.3d 511, 525 (5th Cir. 2004) (directing the district court to balance a number of interests in the context of rejection under section 365 of the code, including that of the public, other utility companies and consumers) (citing *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984) (requiring the bankruptcy court to balance the interests of the debtor, the creditors and the employees when determining what constitutes a successful rehabilitation)).

### C. Continuation of Stay Conditioned to Protect the Public Interest

Generally, in bankruptcy matters, the public interest is served by preserving value and jobs where possible. In the instant case, the public interest is also represented by the City through the Tax Incentive Agreement. That agreement reflects the City's determination of the importance of the Property to the City's 2006 Comprehensive Plan.[22] The public has a significant interest in the operation of the Property as a first class hotel in accordance with the Tax Incentive Agreement.[23]

---

[21] From the use of the word "origination" in Vestin's corporate name, the court infers that Vestin loaned Borrower funds obtained from investors or other third parties. The court thus also has some concern for those entities in whose service Vestin and its affiliates employed tactics which, though not illegal, were, at best, not wise.

[22] The court takes judicial notice of Fort Worth, Tex., Ordinance 16825-02-2006 (Feb. 21, 2006), in which the City adopted a comprehensive plan for the growth and development of the City (the "2006 Comprehensive Plan"). The City intends to update its comprehensive plan annually. *Id.* After adopting the 2005 Comprehensive Plan, the City's Planning Department, the Zoning Commission, City Plan Commission, and the City Council conducted working sessions and published a draft of the 2006 Comprehensive Plan. *Id.* The Planning Department conducted 27

Should the court grant the Motion to Dismiss or terminate the automatic stay, the effect would be to return the parties to state court. Based on the record before it, the court anticipates that dismissal of this case or termination of the stay will not end the disputes between the two lenders but simply will end one phase of an ongoing series of litigations. The result for the Property – and by extension the City – will be for it to serve as a fraying rope in a continuing tug of war between Dougherty and Vestin. To expect the Property to maintain, let alone improve, the quality of its operations in those circumstances is unrealistic.

Should, on the other hand, the Property remain in the custody of this court, it may be insulated from the harm it could suffer as the focus of lawsuits in other forums. Through its ability to monitor and oversee Debtor's operations, through the protections offered by the automatic stay[24] and through the ability to appoint, if necessary, a neutral trustee to manage the Property, the court can protect the Property and ensure its service of the public interest.

Moreover, the court may do this while protecting the legitimate interests of Dougherty (and Vestin). From Dougherty's perspective, any delay in its exercise of its

---

community meetings to receive comments on the plan. *Id.* The City Plan Commission and the City Council each conducted a public hearing before the City Council adopted the 2006 Comprehensive Plan. *Id.* The court gives the City's findings deference. *See id.*

[23] In 2002, a study was undertaken on behalf of the City that revealed the City had only 47% of the first class hotel rooms it would need to be competitive amongst its peers in attracting convention business to the Fort Worth Convention Center. *See* Tax Incentive Agreement. Consistent with the 2006 Comprehensive Plan, the City's economic development programs are based on a model of custom-designed partnerships with private entities to ensure the growth and diversification of the local economy. *Id.* The City Council found that by entering into the Tax Incentive Agreement, the potential economic benefit that would accrue to the City would be consistent with the City's economic development objectives. *Id.*

[24] The ongoing dispute of the parties has already jeopardized the Property's ability to maintain a "First-Tier Flag." *See* Tax Incentive Agreement, § 2. This is in addition to the issues respecting Richfield's obligation to continue managing the Property.

remedies admits "the possibility that the security will decline in value over the life of the loan . . . to the point where it is no longer adequate." *In re James Wilson Assocs.*, 965 F. 2d 160, 172 (7th Cir. 1992).

The possibility that the Property will deteriorate in value is very real. Not only may the Dougherty-Vestin dispute lead to deterioration, but Dougherty's oversecured position is subject to the vagaries of the marketplace. The court takes judicial notice of the uncertainties plaguing the national economy – and, of necessity, that of Texas – such as slow growth or even economic meltdown in Europe.

While Dougherty presently benefits from a substantial equity cushion, the difference between the September Appraisal and the March Appraisal supports an inference that the Property has gone down in value, not up. Given future uncertainties, the court is reluctant to allow Debtor the opportunity to restructure the indebtedness against the Property without providing Dougherty with further protection of its position.

In *In re FRE Real Estate, Inc.*, 450 B.R. 619, 628-29 (Bankr. N.D. Tex. 2011), this court conditioned continuation of the automatic stay on posting of a cash or cash equivalent bond with the court to protect the lender in that case. Providing for such a cushion to protect Dougherty is consistent with the broad range of relief section 362(d) of the Code authorizes the court to grant.[25] The court concludes that, while the Motions should not be granted, a similar device is suitable in the present case.

### III. Order

Based upon the record of the Hearing and other relevant proceedings in this chapter 11 case, it is

---

[25] The case at bar is distinguishable from *FRE* because, among other differences, the lender here (Dougherty) is oversecured.

**ORDERED** that the Motion to Dismiss be, and it hereby is, **DENIED**, without prejudice; and it is further

**ORDERED** that the automatic stay of section 362(a) of the Code shall terminate pursuant to section 362(d)(1) of the Code at 10:00 a.m. local time on August 24, 2012, unless, prior to such time, Debtor deposits in the registry of this court $1,000,000 (the "Deposit"), in the form of cash (or a cash equivalent satisfactory to the court),[26] to be dealt with as described herein, in which event the stay of section 362(a) shall continue as hereinafter provided; and it is further

**ORDERED** that, if the prior decretal paragraph is satisfied, Debtor shall have until November 24, 2012 to obtain an order of this court confirming a plan pursuant to Code § 1129, provided, however, Debtor shall pay to Dougherty by September 5, 2012, October 5, 2012, and November 5, 2012 the additional sum of $241,000.00; and it is further

**ORDERED** that, if Debtor has not obtained an order of this court confirming a plan pursuant to Code § 1129 by November 24, 2012, the stay of Code § 362(a) and the exclusive right of Debtor to propose and solicit acceptances of a plan under Code § 1121 shall terminate; and it is further

**ORDERED** that the court may, due to, *inter alia*, delays imposed on the plan process by Dougherty, extend and/or otherwise modify this order; and it is further

**ORDERED** that, if Debtor (or one of its affiliates) posts the cash bond provided for herein and timely confirms a plan pursuant to Code § 1129 as provided for herein, the Deposit shall be disposed of as provided in the plan; and it is further

---

[26] If Debtor, Vestin and Dougherty agree to an alternative such as a payment against the Senior Loan, the court will approve such an arrangement provided that Vestin agrees to pay administrative costs of this chapter 11 case allowable pursuant to Code §§ 507(a)(2) and 503(b).

**ORDERED** that, if Debtor (or one of its affiliates) posts the cash bond provided for herein but does not timely obtain an order of this court confirming a plan, such cash bond shall be disposed of as follows: first in payment to Dougherty of any deficiency in its collateral to satisfy its claims in this case, such deficiency to be determined by this court; second in payment of all administrative expenses of this case allowable under Code §§ 507(a)(2) and 503(b); and third to Vestin.

### ### END OF MEMORANDUM OPINION AND ORDER ###