

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed June 11, 2014**

United States Bankruptcy Judge

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| 1701 COMMERCE, LLC, F/K/A | § | |
| PRESIDIO FT. WORTH HOTEL, LLC, | § | CASE NO. 12-41748-DML-11 |
| | § | |
| DEBTOR. | § | |
| | § | |

### MEMORANDUM OPINION AND ORDER

Before the court is *Debtor's Motion and Objection to Claim and Brief in Support Thereof*

(the "Objection," docket no.[1] 513), filed by 1701 Commerce, LLC ("Debtor") in response to

claim 29-1 (the "Claim") filed by Key Construction, Inc. ("Key"). The Objection was joined by

Vestin Originations, Inc. ("Vestin") and Vestin Realty Mortgage I, Inc.; Vestin Realty Mortgage

---

1    "Docket no." will hereinafter refer to the corresponding docket entry in the above-captioned bankruptcy
case (the "Case").

II, Inc.; and Vestin Fund III, LLC (collectively, the "Vestin Affiliates").[2] The court held a two-day trial on the Objection on February 11 and March 19, 2014 (collectively, the "Trial"), at which the court heard argument from counsel, received testimony from several witnesses,[3] and admitted into evidence exhibits identified as necessary below.[4] In advance of the Trial, the parties each filed a pretrial brief and a response brief regarding the Objection.[5] Debtor filed supplemental pretrial briefs on the eve of the second day of the Trial.[6] Following the Trial, the court took the Objection under advisement. Both parties filed post-trial briefs.[7]

The Claim hinges upon Key proving that Debtor was the recipient of a fraudulent transfer. For the reasons discussed below, the court concludes that no fraudulent transfer occurred. As a result, the Objection will be sustained, and the Claim will be disallowed.

---

2 Debtor's and Vestin's interests align as to the Objection, and Vestin took the lead in litigating the Objection. Nevertheless, for clarity and continuity the court will ascribe to Debtor those arguments advanced by both Vestin and Debtor.

3 The testifying witnesses included: Craig Burr, Senior Vice President of Debtor and attorney for Vestin ("Burr"); Daniel Stubbs, a consultant and former loan underwriter for Vestin and an officer of Debtor ("Stubbs"); Eric Lewis, Debtor's expert valuation witness from Cushman & Wakefield ("Lewis"); and John L. Walker, Jr., Key's Chief Financial Officer ("Walker"). The parties also agreed to designate as testimony excerpts from the deposition of Sushil Patel, Presidio's principal ("Patel"), subject to objections marked alongside the excerpts (the "Patel Deposition"). Unless otherwise noted, to the extent the court relies upon an excerpt of Patel's testimony that is subject to objection by either party, that objection is overruled.

4 The exhibits will be identified as "____ Exhibit *n*," where "____" indicates the introducing party (*i.e.*, Key, Debtor, or Joint) and "*n*" indicates the number of the exhibit. Pursuant to an agreement of the parties, most of the exhibits were admitted as joint exhibits. *Final Am. Joint Ex. List for the [Trial] Related to [the Claim]*, docket no. 623. In contested matters, it is also appropriate for the court to look to the entire record of the bankruptcy case. *In re Mirant*, 354 B.R. 113, 120 n.4 (Bankr. N.D. Tex. 2006) (citing *Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 203 (3d Cir. 1995)).

5 *Pre-Trial Br. [of Debtor and Vestin] in Supp. of [the Objection]*, docket no. 585 ("Debtor Pre-Trial Brief"); *Pre-Trial Br. of [Key] in Supp. of Its Resp. to [the Objection]*, docket no. 584 ("Key Pre-Trial Brief"); *Resp. to Pre-Trial Br. of [Key]*, docket no. 594 ("Debtor Response Brief"); *Br. of [Key] in Resp. to [Debtor Pre-Trial Br.]*, docket no. 593 ("Key Response Brief").

6 *Debtor's & Vestin's Bench Br. Regarding Distressed Value*, docket no. 612; *Debtor's & Vestin's Bench Br. in Supp. of Objection to Key Ex. 156*, docket no. 611; *Bench Br. Regarding Admissibility of Debtor Exs.*, docket no. 610.

7 *Post-Trial Br. in Supp. of [the Objection]*, docket no. 625 ("Debtor Post-Trial Brief"); *Post-Trial Br. of [Key]*, docket no. 624 ("Key Post-Trial Brief").

Filing an objection to a proof of claim initiates a contested matter under Federal Rule of Bankruptcy Procedure[8] 9014.[9]  This contested matter is subject to the court's core subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(1), (2)(A)–(B), and (O).  The court has constitutional authority to enter a final order because determining the Objection involves the quintessential claims allowance process.[10]  This memorandum opinion and order constitutes the court's findings of fact and conclusions of law pursuant to Rules 7052 and 9014.

---

[8]    Hereinafter, "Rule" or "Rules," as appropriate.

[9]    *I.R.S. v. Taylor (In re Taylor)*, 132 F.3d 256, 260 (5th Cir. 1998).

[10]   The Supreme Court recently addressed its decision in *Stern v. Marshall*, 546 U.S. ___, 131 S. Ct. 2594 (2011), directing that a bankruptcy court should issue proposed findings of fact and conclusions of law to be reviewed *de novo* by a district court when a statutorily core claim runs afoul with Article III.  *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. ___, No. 12–1200, 2014 WL 2560461, at *7 (U.S. June 9, 2014).  In *Executive Benefits*, the Supreme Court assumed without deciding that *Stern* infected the fraudulent transfer claim at issue, but concluded that a *de novo* review of the bankruptcy court's proposed findings of fact and conclusions of law cured any such deficiency.  *Id.* at *8.  Notably, the decision in *Executive Benefits* left unanswered "whether Article III permits a bankruptcy court, with the consent of the parties, to enter final judgment on a *Stern* claim."  *Id.* at *4 n.4.  As a result, the decision in *Executive Benefits* leaves unaltered Fifth Circuit precedent that parties may not confer constitutional competency upon a bankruptcy judge by consenting to a final order on a *Stern* claim.  *See BP RE, L.P. v. RML Waxahachie Dodge, L.L.C. (In re BP RE, L.P.)*, 735 F.3d 279, 286–87 (5th Cir. 2013); *Frazin v. Haynes & Boone, L.L.P. (In re Frazin)*, 732 F.3d 313, 320 n.3 (5th Cir. 2013).

Nonetheless, the procedural posture of this matter insulates the court's competency from the disposition in *Executive Benefits*.  This matter involves the unusual situation where the bankrupt received, rather than the made, the transfer.  Thus, although requiring the court to determine a fraudulent transfer, the Objection is necessarily resolved in the claims allowance process.  *See Stern*, 131 S. Ct. at 2617–18 ("[T]he question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.").  Moreover, the estate here would be the defendant asserting a jury demand, thus the private-rights analysis of the Seventh Amendment in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1982), is inapposite.  *See Exec. Benefits*, 2014 WL 2560461, at *4 n.3 (citing *Granfinanciera*, 492 U.S. at 55, 64).  As a result, the court may enter a final order on the Objection.  To the extent that the Objection may implicate *Stern*, the court holds that the factual findings and legal conclusions specific to the alleged fraudulent transfer are necessary to finally determine the Objection.  *Cf. BP RE*, 735 F.3d at 286–87; *Frazin*, 732 F.3d at 320 n.3.

# I. BACKGROUND

This matter centers on the checkered ownership history of the Sheraton Fort Worth Hotel and Spa (the "Property"). The court's earlier opinion in the Case details much of the history, but some recitation and additional discussion are necessary to determine the Objection.[11]

## A. The Prepetition Ownership of the Property

Presidio Hotel Fort Worth, L.P. ("Presidio"), a limited partnership formed under Texas law, acquired title to the Property on February 28, 2006.[12] A year later, Presidio obtained financing through Dougherty Funding, LLC and ten junior note-holders (collectively, "Dougherty") in the original principal amount of $38,975,000[13] (the "Senior Loan") to rehabilitate the Property. The Senior Loan was secured by a deed of trust and a first priority mortgage on the Property.

In May 2008, Presidio obtained $10,600,000 of mezzanine financing (the "Junior Loan") from Vestin, which several months later was increased to $11,800,000. Vestin perfected a second lien on the Property and assigned the Junior Loan to the Vestin Affiliates in May 2008. Dougherty and Vestin then entered into a Subordination and Intercreditor Agreement (the "Intercreditor Agreement") that established each creditor's rights to the Property, including situations in which each creditor could foreclose on the Property.[14]

---

11    *See In re 1701 Commerce, LLC*, 477 B.R. 652 (Bankr. N.D. Tex. 2012) (the "Prior Opinion"). Capitalized terms not otherwise defined in this memorandum opinion and order will have the same meaning ascribed in the Prior Opinion.

12    *Objection*, docket no. 513, ¶ 9.

13    As mentioned in the Prior Opinion, some discrepancy exists in the record regarding whether the original principal amount of the Senior Loan was $39.6 million or $38.975 million. 477 B.R. at 654 n.2. The court will use the lower amount pled by Debtor in the Objection. *See Objection*, docket no. 513, ¶ 10. The result is the same with either figure. *See infra* note 106 and accompanying text.

14    *In re 1701 Commerce, LLC*, 477 B.R. at 654–55.

In addition to the Junior and Senior Loans, the Property benefitted from a twenty-year tax incentive agreement with the City of Fort Worth (the "TOT Agreement").[15]  By the TOT Agreement, the City of Fort Worth provided a rebate of the City's Hotel Occupancy Tax (also called a Transient Occupancy Tax) that generated to the TOT Agreement's owner hundreds of thousands of dollars annually.[16]  The evidence presented at the Trial established the TOT Agreement's value as approximately $6.3 million.[17]  Although the TOT Agreement could be owned separately from the Property, the TOT Agreement's value depended upon the Property's continued operations.[18]

Throughout 2011, Presidio, by and through Patel, worked with a broker to sell the Property.  These efforts were unsuccessful in consummating a sale.  Also in 2011, Patel worked with Vestin to extend the Junior Loan, which was to mature on December 30, 2011.  Aware that Presidio would have difficulty meeting its obligations, Vestin created Debtor, a Nevada limited liability company, on October 31, 2011, "as a special purpose vehicle to take the place of the Vestin Affiliates in the future."[19]  Vestin declined to extend the Junior Loan and thereafter the Vestin Affiliates transferred their interests in the Junior Loan to Debtor, pursuant to an assignment of deed of trust.[20]

---

15  Joint Exhibit 45.

16  *See* Joint Exhibit 175 at 235:22–237:17.

17  Debtor's expert Lewis testified that he valued the TOT Agreement at $6.3 million.  *Feb. 11 Tr.*, docket no. 607, at 43:17–22.  Before Debtor filed the Case, Dougherty had obtained a separate appraisal of the Property's value as of September 1, 2011, (the "September Appraisal") that valued the TOT Agreement separately from the real property at $6.2 million.  Key Exhibit 156 at V-21–22, V-32.

18  *Feb. 11 Tr.*, docket no. 607, at 55:3–25.

19  *In re 1701 Commerce*, 477 B.R. at 655 (citing Debtor Exhibit 163 at 69–70).

20  *Id.*

Presidio defaulted on its obligations under both the Junior and Senior Loans in December 2011.[21] Patel spent much of the next month scrambling to restructure the Junior and Senior Loans. Through negotiation, Debtor and Dougherty agreed on a framework that would have extended the maturity of both the Junior and Senior Loans until December 31, 2012, so that Presidio could market the Property for sale.[22] As part of this framework, Presidio would have escrowed the Property's deed to be released if certain benchmarks for sale were not achieved.[23]

While these negotiations were ongoing, Debtor sent the required notice of default to Presidio on January 4, 2012;[24] filed a *Notice of Trustee's Sale* of the Property on January 17, 2012;[25] and posted the Property for foreclosure sale on February 7, 2012.[26] Dougherty and Presidio tried to stop the foreclosure sale by filing suit in state court on February 3, 2012.[27] Negotiations to restructure the Junior and Senior Loans stalled during this time and reached an impasse on the afternoon of Monday, February 6, as Dougherty and Debtor could not agree as to which lender would acquire the Property's deed from escrow if Presidio failed to satisfy the required conditions.[28] The Property was slated to be sold the following morning.

---

21    *Id.*

22    *Feb. 11 Tr.*, docket no. 607, at 81:8–82:7.

23    *Id.* at 84:5–19.

24    Joint Exhibit 22.

25    Joint Exhibit 23.

26    *In re 1701 Commerce*, 477 B.R. at 655.

27    *Id.* at 655–56.

28    *Feb. 11 Tr.*, docket no. 607, at 81:13–17, 83:16–84:19.

*B. The Deed in Lieu Agreement*

Debtor never foreclosed upon the Property. Instead, before placing Presidio into bankruptcy to prevent foreclosure on the Property, Patel contacted Mike Shustek, CEO of Vestin, the evening of February 6 to discuss an alternative arrangement.[29] This phone call led to a Deed in Lieu Agreement (the "Deed in Lieu Agreement" or "DILA"), pursuant to which Presidio agreed to transfer to Debtor title to the Property subject to any superior liens and encumbrances in exchange for releases of Presidio's obligations under the Junior Loan and of Presidio's principals' personal guarantees.[30] Presidio executed a deed to implement the Deed in Lieu Agreement and recorded that deed the next day.[31]

The Deed in Lieu Agreement was signed by representatives of Presidio, Debtor, and PHM Services, Inc. ("PHM"), an affiliate of Presidio.[32] PHM was appointed, as an independent contractor, as asset manager for the Property at a rate of $1000 per month—despite Richfield Hospitality, Inc. ("Richfield") already managing the Property—and PHM was granted the exclusive right to sell the Property for approximately six months.[33] PHM would also potentially share in the profits of a sale. Paragraph 6 of the DILA included a "Profit Sharing" agreement that dictated the proceeds would be distributed: first, to satisfy Dougherty's Senior Loan; second, to pay Debtor $11 million; third, to pay PHM $3 million; and fourth, to divide between PHM and Debtor, in equal portions, any excess proceeds.[34] PHM—not Presidio—benefitted under this

---

29    *Id.* at 84:21–85:18, 89:1–3; Joint Exhibit 173 at 94:4–7, 94:23–95:1, 189:3–190:16.

30    Joint Exhibit 56 ¶¶ 3, 7.7, 7.8.

31    Joint Exhibit 58.

32    Joint Exhibit 56 at 9. Patel signed the Deed in Lieu Agreement both as manager of Presidio and authorized officer of PHM. *Id.*

33    Joint Exhibit 56 ¶¶ 5.1, 5.3(p), 5.4; Joint Exhibit 59 at 2.

34    Joint Exhibit 56 ¶ 6.

Profit Sharing agreement, such that any equity, if present, would flow to PHM and, eventually, to PHM and Debtor, rather than Presidio. Finally, the parties to the DILA were bound by a confidentiality provision not to disclose the terms of the DILA except as required by law.[35]

Dougherty and Key[36] were both notified of the Deed in Lieu Agreement. Dougherty was notified by a letter from Patel to Dougherty's principals dated February 10, 2012, that explained the Deed in Lieu Agreement.[37] As to Key, Presidio did not respond to a demand letter dated January 10, 2012, regarding delinquent payments.[38] Instead, Walker emailed Patel on February 3, 2012, regarding the outstanding debt, to which Patel responded on February 14, 2012, stating that "The [P]roperty was deeded back to the lender on February 7th."[39] Moreover, on March 16, 2012, Vestin, a public company, filed its Form 10-K with the SEC in which it disclosed the Deed in Lieu Agreement, stating:

> On February 7, 2012, [Vestin] entered into a Deed in Lieu Agreement with a borrower for a second deed of trust loan that matured on December 31, 2011 with a balance of approximately $11.8 million, of which our portion was approximately $0.2 million. These assets are subject to a first trust deed of approximately $39 million. The property includes a 430 unit full service hotel located in Ft. Worth, Texas. The hotel includes operations which will be consolidated into our financial statements from the date of this agreement. The property will be held for sale and pursuant to the terms of the agreement the net proceeds from the sale shall be distributed as follows through July 31, 2012: (i) satisfy all amounts due on the first deed of trust, (ii) $11 million to [Vestin], (iii) $3 million *to the former borrower* and (iv) all remaining amounts will be divided with 50% going to [Vestin] and 50% going *to the former borrower*.[40]

---

35      *Id.* ¶ 7.1.

36      At this point, Key was owed approximately $2 million for construction services rendered to Presidio. *See infra* Section I.D.

37      Joint Exhibit 59.

38      Joint Exhibit 66 at 1; *Mar. 19 Tr.*, docket no. 620, at 138:22–139:7.

39      Joint Exhibit 67 at 1–2.

40      Debtor Exhibit 161 at 30 (emphasis added). *See also Key Pre-Trial Br.*, docket no. 584, ¶ 14 n.4.

While the text of Vestin's Form 10-K misstates that "the former borrower" (Presidio) rather than PHM would share in the profit distribution, the complete Deed in Lieu Agreement was attached as an exhibit to the Form 10-K and was accessible by a link alongside the Form 10-K on the SEC's public filings website.[41]

### C. The Bankruptcy Filing

Following the Deed in Lieu Agreement, Dougherty sought to foreclose on the Senior Loan. Debtor obtained a temporary restraining order in state court based on the Intercreditor Agreement to keep Dougherty from foreclosing.[42] On March 26, 2012, the evening before an evidentiary hearing on the restraining order was scheduled in state court, Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code[43] (the "Petition Date").

Dougherty subsequently filed a *Motion for Dismissal Pursuant to § 1112(b)(4)* (docket no. 26, the "Motion to Dismiss") and a *Motion for Relief of the Automatic Stay Pursuant to § 362(d)* (docket no. 25, the "Motion for Relief," together with the Motion to Dismiss, the "Motions"). By the Motions, Dougherty argued Debtor filed the Case in bad faith, warranting dismissal under section 1112(b)(4) or relief from the stay under section 362(d)(1).[44] On August 23, 2012, the court issued the Prior Opinion in which it held the Case was filed in bad faith.[45] Rather than granting the Motion to Dismiss, the court modified and conditioned the automatic stay to provide Dougherty adequate protection by requiring Debtor to (1) deposit $1,000,000 into the court registry; (2) make three future adequate protection payments to Dougherty of $241,000;

---

41 Debtor Exhibits 161–62; *Feb. 11 Tr.*, docket no. 607, 155:10–158:9. *See infra* notes 207–208.

42 *In re 1701 Commerce*, 477 B.R. at 655–56.

43 11 U.S.C. §§ 101 *et seq.* (2006) (the "Code").

44 *In re 1701 Commerce*, 477 B.R. at 656.

45 *Id.* at 659.

and (3) obtain a confirmation order for a plan of reorganization by November 24, 2012, to avoid forfeiting the $1,000,000 deposit and the stay lifting automatically.[46] Vestin deposited $1,000,000 for Debtor into the court registry, and the stay remained in place.

The Case ultimately resulted in the sale of the Property, after negotiation and litigation over the TOT Agreement and Presidio's desire to reacquire the Property. On November 5, 2013, the court approved a proposed sale of the Property for $55 million free and clear of all liens and encumbrances to PHC Management, Inc. ("Prism").[47] By the Prism Sale Order, the court also authorized Debtor to propose, discuss, investigate, and pursue alternative options for a potential sale to a different buyer.[48] Prism terminated its agreement to purchase the Property after a series of setbacks, including an inability to obtain sufficient financing after discovering that a larger-than expected amount of funds were required to be escrowed at closing for improvements to the Property under the Property Improvement Plan Agreement (the "PIP Agreement") with Starwood Hotels & Resorts Worldwide, Inc. ("Starwood").[49] Following Prism's termination of the sale, Debtor sought alternative buyers, including from among the offers received prepetition.[50] On February 13, 2013, the court approved a proposed sale of the Property for $49.3 million free and clear of all liens and encumbrances to 1701 Commerce Acquisitions, LLC, a group led by Presidio's principals ("1701 Commerce Acquisitions").[51] The sale to 1701 Commerce Acquisitions closed on July 17, 2013, and Dougherty was paid in full from the sale

---

46    *Id.* at 660–61.

47    Debtor Exhibit 37 (the "Prism Sale Order").

48    *Id.* at 20.

49    *See Feb. 11 Tr.*, docket no. 607, at 16:16–20:7 (Lewis discussing Joint Exhibits 36 and 38).

50    The amount and substance of these offers will be discussed more fully along with the value of the Property. *See infra* Section II.B.3. For testimony concerning the substance of these offers, see *Feb. 11 Tr.*, docket no. 607, at 31:7–35:23.

51    Debtor Exhibit 41 at 2–3.

proceeds.[52] As part of the closing, 1701 Commerce Acquisitions escrowed $4.1 million for improvements to the Property.[53] Also paid by 1701 Commerce Acquisitions upon closing was $300,000 to Covenant Clearinghouse, LLC, which represented a one-percent interest in the gross sales price shared by several entities, including Presidio (the "One-Percent Interest").[54] On January 9, 2014, the court entered an order confirming *Debtor's First Amended Plan of Reorganization* (docket no. 544, the "Plan"), which administered the approximately $4 million of cash remaining in the estate after the sale of the Property to 1701 Commerce Acquisitions.[55]

### D. Key's Claim

Key provided various construction services during Presidio's renovation of the Property, including concrete, interior finishes, roofing, windows and doors, plumbing, fire protection, HVAC, and electrical work.[56] A dispute arose between the parties regarding the accounting of construction expenses and the remaining amounts owed. On April 15, 2009, Key recorded a mechanic's lien in the amount of $3,216,266, the amount that Key asserted remained payable for services rendered.[57] At this time, Presidio had already paid Key approximately $22,478,735.[58] The parties reached a settlement agreement by which (1) the total contract sum for Key's work would be modified to $24,719,358.97 and (2) Presidio would pay Key an additional $2,240,623.97 in the form of a partial payment of $574,623.97 and a promissory note in favor of

---

52    Specifically, Dougherty received $44,122,000 in cash from the proceeds and a $2.1 million credit for funds escrowed during the due diligence period. Debtor Exhibit 43 at 1–2.

53    Debtor Exhibit 42 at 2; *see also* Joint Exhibit 36 (the PIP Agreement).

54    *See* Joint Exhibit 50; *Feb. 11 Tr.*, docket no. 607, at 20:22–21:19, 40:15–23. The amount was related to a settlement for the One-Percent Interest, thus the amount does not equal one half of one percent of the gross sales price. *See* Joint Exhibit 175 at 252:1–253:12.

55    *Order Confirming [the Plan]*, docket no. 570.

56    Joint Exhibit 63 at 1.

57    Joint Exhibit 60 at 1.

58    Joint Exhibit 63 at 3.

Key in the amount of $1,666,000 (the "Presidio/Key Note").[59] The Presidio/Key Note matured on December 31, 2011. On January 10, 2012, Key sent Presidio a demand letter for payment of the Presidio/Key Note.[60] Key then sued in state court for payment of the Presidio/Key Note and obtained a default judgment against Presidio on April 30, 2012.[61]

On August 8, 2012, Key filed the Claim in the amount of $2,032,609.07, which represented the amounts owed for principal, interest, attorney's fees, and court costs related to the Presidio/Key Note.[62] On October 9, 2013, Debtor filed the Objection. Because Key obtained a judgment against Presidio and not Debtor, Key must demonstrate that the Deed in Lieu Agreement constituted a transfer intended to hinder, delay, or defraud Presidio's creditors to overcome the Objection.[63]

## II. DISCUSSION

A proof of claim is prima facie evidence of the claim's validity.[64] An objecting party must present evidence sufficient to overcome this prima facie validity.[65] Once the objecting party has met this burden, the burden falls to the party that would have the burden of proof respecting the claim in a non-bankruptcy context.[66] By the Objection, Debtor argues the Claim

---

59 *Id.* at 3–4; Joint Exhibit 61 at 1; *Mar. 19 Tr.*, docket no. 620, 132:16–25.

60 Joint Exhibit 66 at 1.

61 Joint Exhibit 68 at 1–2.

62 Joint Exhibit 69 at 1.

63 The transfer could not have been constructively fraudulent because reasonably equivalent value passed. *See infra* Section II.C.8.

64 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f).

65 *Cal. State Bd. of Equalization v. Official Unsecured Creditors' Comm. (In re Fid. Holding Co., Ltd.)*, 837 F.2d 696, 698 (5th Cir. 1988).

66 *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 21 (2000) (holding that rights created by state law should not "be analyzed differently simply because an interested party is involved in a bankruptcy proceeding") (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)).

should be disallowed as unenforceable against Debtor under Texas law.[67]  The evidence before the court sufficiently overcomes the Claim's prima facie validity, thus Key must prove each of the elements of its fraudulent transfer allegations by a preponderance of the evidence.[68] Specifically, Key must demonstrate that Texas law allows Key to assert the Claim against Debtor and that the Deed in Lieu Agreement constituted a fraudulent transfer to Debtor within the meaning of the Texas Uniform Fraudulent Transfer Act (the "TUFTA").

### A. If Proven, a Fraudulent Transfer Would Be an Adequate Basis for the Claim

The court must first address a threshold question of whether the claim is unenforceable against Debtor even assuming Key proves a fraudulent transfer occurred.  Key asserts the alleged fraudulent transfer between Presidio and Debtor makes Debtor liable for the Claim under the theory of successor liability.[69]  Debtor counters that the Claim is baseless because Texas law does not recognize a fraudulent transfer exception to the general rule of successor non-liability.[70] Debtor is correct as to Texas law on successor liability, but incorrect that the Claim is baseless because a fraudulent transfer, if proven, would afford Key remedies directly against Debtor.

---

67     *Objection*, docket no. 513, ¶¶ 43–44; *see* 11 U.S.C. § 502(b)(1).

68     *See Walker v. Anderson*, 232 S.W.3d 899, 913 (Tex. App.—Dallas 2007, no pet.).

69     *Key Pre-Trial Br.*, docket no. 584, ¶¶ 16–17.

70     In its post-trial brief, Debtor argues that Key abandoned its successor liability argument by establishing on cross-examination, and admitting in its pre-trial brief, that Debtor did not expressly assume any of Presidio's debts.  *Debtor Post-Trial Br.*, docket no. 625, at 20 & n.128 (citing *Feb. 11 Tr.*, docket no. 607, at 144:7–9; *Key Pre-Trial Br.*, docket no. 584, ¶ 9).  The court disagrees.  Successor liability appears to be the only basis Key has pled for the Claim.  *See Key Pre-Trial Br.*, docket no. 584, ¶ 9; Joint Exhibit 69.  Key need not re-urge these grounds in post-trial briefing to preserve its argument.  As a result, the court will address the merits of Key's successor liability argument.

*1. A Fraudulent Transfer Does Not Create Successor Liability Under Texas Law*

Texas strongly embraces the general rule that a successor entity in an asset transfer is not liable for the grantor's liabilities.[71] The limited exceptions to the general rule are provided in section 10.254 of the Texas Business Organizations Code, which states:

> (a) A disposition of all or part of the property of a domestic entity, regardless of whether the disposition requires the approval of the entity's owners or members, is not a merger or conversion for any purpose.

> (b) Except as otherwise expressly provided by statute, a person acquiring property described by this section may not be held responsible or liable for a liability or obligation of the transferring domestic entity that is not expressly assumed by the person.[72]

Some confusion regarding the law appears to have come from the Texas legislature re-codifying section 10.254 from its predecessor statute in the Texas Business & Commerce Code, but the substantive law remains the same.[73] As a result, "Texas law allows a successor to acquire the assets of a corporation without incurring any of the grantor corporation's liabilities unless the successor expressly assumes those liabilities."[74]

The confusion regarding Texas's exceptions to the general rule of successor non-liability also stems from the decision in *Mozingo v. Correct Manufacturing Corp.*.[75] There, the Fifth Circuit applied Mississippi law, which mirrors the majority rule of successor liability reflected in section 12 of the Restatement (Third) of Torts: Products Liability (the "Restatement"), to analyze

---

71    *E-Quest Mgmt. v. Shaw*, --- S.W.3d ----, No. 01-11-00296, 2013 WL 1281767, at *4–5 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 139 (Tex. App.—Houston [1st Dist.] 2000, pet. denied).

72    TEX. BUS. ORGS. CODE ANN. § 10.254 (West 2012).

73    *See E-Quest*, 2013 WL 1281767, at *5.

74    *Id.* at *5–6 (citing *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768 (Tex. App.—Houston [1st Dist.] 2004, no pet.)); *Mudgett v. Paxson Mach. Co.*, 709 S.W.2d 755, 758–59 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.) (rejecting alternate theories of successor liability under Texas law).

75    752 F.2d 168 (5th Cir. 1985).

liability of a successor corporation in an asset transfer.[76]   Under the Restatement, a successor corporation in an asset acquisition is liable for the predecessor's obligations if the acquisition:

(a) is accompanied by an agreement for the successor to assume such liability; or

(b) results from a fraudulent conveyance to escape liability for the debts or liabilities of the predecessor; or

(c) constitutes a consolidation or merger with the predecessor; or

(d) results in the successor becoming a continuation of the predecessor.[77]

In *Lockeed Martin*, the First District Court of Appeals addressed how Texas law on successor liability diverges from the majority view represented by the Restatement.[78]   Specifically, Texas has (1) expressly adopted the first exception of express assumption by section 10.254(b);[79] (2) expressly rejected the "de facto merger" doctrine by section 10.254(a);[80] and (3) rejected the continuation exception under Restatement section 12(d) by case law.[81]   Critically, the court in *Lockeed Martin* did not address the second and remaining exception under the Restatement— fraudulent conveyances.

The omission of such discussion in *Lockeed Martin* and subsequent cases does not, as Key argues, mean that a fraudulent transfer, by negative inference, is a second recognized exception to the general rule of successor non-liability.[82]   Instead, the only two exceptions under Texas law are provided in section 10.254—either (1) express assumption or (2) liability

---

76    *Compare id.* at 174–75, *with* Restatement (Third) of Torts: Prods. Liability § 12 (1998).

77    Restatement § 12.

78    16 S.W.3d at 135 n.6, 139–40.

79    *Id.* at 135 n.6, 139.  Section 10.254(b) is the successor statute to article 5.10(B)(2), the provision that the court in *Lockeed Martin* addressed.

80    *Id.* at 135 n.6.  Section 10.254(a) is the successor statute to article 5.10(B)(1).

81    *Id.* (citing *Mudgett*, 709 S.W.2d at 758–59).

82    *Key Pre-Trial Br.*, docket no. 584, ¶ 16 (citing *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 233 (S.D. Tex. 2011)); *see also Ford Bacon & Davis, LLC v. Travelers Ins. Co.*, No. 08-2911, 2010 WL 1417900, at *5–6 (S.D. Tex. Apr. 7, 2010).

conferred by another statute.[83] This court, like other courts, has been unable to locate a Texas statute providing that a fraudulent transfer creates successor liability.[84] Thus, only express assumption is grounds for successor liability under Texas law.[85]

Here, Debtor did not expressly assume Presidio's liabilities under the Deed in Lieu Agreement or at any time thereafter.[86] Further, Joint Exhibit 51 paints the financial picture of Presidio as of December 31, 2011, including an aged trial balance of trade creditors.[87] Key does not appear on this list. As a result, even if Debtor had expressly assumed the financial obligations included in the "financial package," Key still would not have been among the liabilities assumed.[88] Without an express assumption or another statute authorizing an additional exception to section 10.254, Key's claim cannot rest on the grounds of successor liability.[89]

### 2. Key May Assert the Claim Directly Against Debtor

The court may nonetheless reach the merits of the fraudulent transfer allegation because another basis for the Claim exists. The parties' briefs focus on Presidio being the "debtor" or

---

83    *Koll Real Estate Grp., Inc. v. Howard*, 130 S.W.3d 308, 315 n.11 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

84    *See Shapolsky v. Brewton*, 56 S.W.3d 120, 139 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("Brewton does not cite, nor does our research reveal, any other statute which expressly provides an exception to the rule of successor non-liability for purchasers of all or substantially all of a corporation's assets."), *abrogated on other grounds by Michiana Easy Livin' Country v. Holten*, 168 S.W.3d 777 (Tex. 2005). Rather than relying on a Texas statute, several federal courts have clouded the proper application of section 10.254 by applying *Mozingo* or the Restatement as authority for Texas law. *See Allied Home Mortg.*, 830 F. Supp. 2d at 233 (citing *Ford Bacon & Davis*); *Ford Bacon & Davis*, 2010 WL 1417900, at *5–6 (citing Restatement); *Stearns Airport Equip. Co., Inc. v FMC Corp.*, 977 F. Supp. 1263, 1269 (N.D. Tex. 1996) (citing *Mozingo*); *United States v. Lang*, 864 F. Supp. 610, 613 (E.D. Tex. 1994) (citing *Mozingo*). These cases are easily distinguishable either for the misapplication of *Mozingo* or for the misinterpretation of *Lockeed Martin*.

85    *Knoll Real Estate Grp.*, 130 S.W.3d at 315 n.11; *Shapolsky*, 56 S.W.3d at 139; *see Lockeed Martin*, 16 S.W.3d at 135 n.6.

86    *Feb. 11 Tr.*, docket no. 607, at 144:7–9; *Key Resp. Br.*, docket no. 593, ¶ 10.

87    Joint Exhibit 51 at 86–93 (Bates nos. 3106–15).

88    *See Feb. 11 Tr.*, docket no. 607, at 94:12–24.

89    Even assuming that a fraudulent transfer would impose successor liability, the Claim would still be disallowed. As will be discussed in Section II.C, the court concludes that Presidio did not transfer the Property by the Deed in Lieu Agreement with an actual intent to hinder, defraud, or delay creditors.

---

transferor for the purpose of the alleged fraudulent transfer but overlook the importance of Debtor being the transferee. A creditor of the transferor in a fraudulent transfer has remedies directly against the transferee as the possessor of the asset.[90] To have this right, the creditor must successfully demonstrate a fraudulent transfer occurred and overcome the bona fide purchaser exception.[91] Having done so, the creditor may then levy against the transferred asset or seek "any other relief the circumstances may require" so long as the relief is "subject to the principles of equity and in accordance with the applicable rules of civil procedure."[92] When the transferee is solvent, the appropriate remedy is to make an attachment under the TUFTA or seek to avoid "the transfer or obligation to the extent necessary to satisfy the creditor's claim."[93] Where the creditor seeks to avoid a transfer under section 24.008(a)(1), "the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less."[94]

Once the transferee files for bankruptcy, the creditor's remedy is to file a proof of claim despite not having reduced to a judgment its alleged right to payment.[95] So Key may assert a claim against Debtor for its direct, rather than successor, liability as the transferee of an alleged fraudulent transfer.

---

90    Tex. Bus. & Com. Code Ann. §§ 24.008–24.009 (West 2012); *see Spring Street Partners IV, L.P. v. Lam*, 730 F.3d 427, 437–38 (5th Cir. 2013) (applying Tex. Bus. & Com. Code § 24.009(b)).

91    Tex. Bus. & Com. Code § 24.009(a).

92    *Id.* § 24.008(a)(2), (3)(C).

93    Tex. Bus. & Com. Code § 24.008(a)(1); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 610–11 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

94    *Id.* § 24.009(b).

95    *See* 11 U.S.C. § 101(5)(A) (defining a claim as a "right to payment, whether or not such right is reduced to judgment . . . ."). Indeed, failing to file a proof of claim once the creditor has notice of the bankruptcy may result in discharge of the creditor's claim. 11 U.S.C. § 1141(d)(1)(A); *cf. Piedmont Trust Bank v. Linkous (In re Linkous)*, 990 F.2d 160, 162 (4th Cir. 1993) (noting that a bankruptcy plan discharging a claim without notice of the bankruptcy would violate due process).

### B. No "Asset" Was Transferred For the Purposes of TUFTA

Before turning to the merits of Key's fraudulent transfer allegation, the court must first address a second threshold question of whether a "transfer" occurred within the meaning of the TUFTA. Without the transfer of an "asset," the parties' intent is irrelevant.[96] Under Texas law, a fraudulent transfer begins with a debtor either transferring an asset or incurring an obligation.[97] A "transfer," in turn, requires the debtor dispose of, or part with, an "asset."[98] Texas law defines an "asset" as "property of a debtor," but expressly excludes "property to the extent it is encumbered by a valid lien."[99] So a transfer of property that is fully encumbered by valid liens may not, as a matter of law, constitute a fraudulent transfer under the TUFTA.[100]

Debtor argues that the security interests of the Junior and Senior Loan fully encumbered the Property, thus the Deed in Lieu Agreement was not subject to the TUFTA.[101] Key counters that Presidio had equity in the Property when it transferred the Property to Debtor, thus a qualifying transfer occurred.[102] Moreover, Key avers that Debtor is estopped from contradicting the alleged admission in Debtor's Schedules A–J (docket no. 53, collectively the "Schedules") regarding the Property's value.[103] Both parties' arguments hinge on the Property's value and the amounts owed on the Junior and Senior Loans on February 7, 2012, the day Presidio transferred

---

96 *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 414 (5th Cir. 2009) (citing *Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821, 836 (N.D. Iowa 2004)).

97 Tex. Bus. & Com. Code § 24.005(a)(1).

98 *Id.* § 24.002(12).

99 *Id.* § 24.002(2)(A).

100 *Id.* § 24.002(8), (13); *Mullins*, 564 F.3d at 414; *see also Tel. Equip. Network*, 80 S.W.3d at 611 (collecting cases that interpret other states' fraudulent transfer provisions congruently).

101 *Debtor Post-Trial Br.*, docket no. 625, at 1.

102 *Key Post-Trial Br.*, docket no. 624, ¶¶ 9–17; *Key Pre-Trial Br.*, docket no. 584, ¶¶ 4–6.

103 *Key Post-Trial Br.*, docket no. 624, ¶¶ 7, 14; *Key Pre-Trial Br.*, docket no. 584, ¶ 6.

the Property to Debtor under the Deed in Lieu Agreement.[104] The court will address the issues of debt, admissions, and value in turn.

### 1. The Valid Liens Encumbering the Property Totaled At Least $57.7 Million

This analysis begins with the aggregate amount of debt between the Junior and Senior Loans as of February 7, 2012. Put simply, Key's interests are best served by a low amount of debt, and Debtor's interests are best served by a high amount of debt. For the purposes of this analysis, where the parties dispute the amount of debt the court will defer to the lower number unless noted otherwise because, as will be discussed, no equity existed in the Property even assuming the lowest estimates of the Junior and Senior Loan balances.[105]

As to Dougherty's Senior Loan, the original principal amount was $38,975,000.[106] The Objection lists the Senior Loan balance as of February 8, 2012, "in the amount of $46 million."[107] An email from John Greisen, Senior Vice President of Dougherty, to Stubbs on February 1, 2012, placed the Senior Loan Balance at $43,190,328.42 before accounting for the escrow balance.[108] Burr testified in detail about Dougherty's and Vestin's reconciliations of the Senior Loan balance as of February 1, 2012,[109] concluding that $43,169,000 was "the most accurate statement [he] could make of what Dougherty was owed on February 1, 2012."[110]

---

104    The date of the Deed in Lieu Agreement is the operative date for determining the Property's value. *ASARCO LLC v. Am.'s Mining Corp.*, 396 B.R. 278, 336 (S.D. Tex. 2008) ("All jurisdictions agree that courts should measure the value of the property transferred and the consideration received at the time of the transfer.").

105    *See supra* note 13.

106    *See supra* note 13.

107    *Objection*, docket no. 513, ¶ 47(a). *See also Key Pre-Trial Br.*, docket no. 584, ¶ 13 n.2 (relying on the Objection when stating that Presidio owed $46 million on the Senior Loan).

108    Joint Exhibit 14 at 1–2.

109    *Feb. 11 Tr.*, docket no. 607, at 194:12–208:18.

110    *Id.* at 207:9–208:14. Debtor's Pre-Trial Brief matches this estimate of Dougherty's Senior Loan, stating that the Property was "subject to a $43.2 million senior secured obligation to Dougherty." *Debtor Pre-Trial Br.*, docket no. 585, at 2–3.

---

Later, Burr testified as to Vestin's reconciliation of the Senior Loan balance as of July 15, 2013, calculating the amount to be $46,222,000, including default interest, modification fees, and attorneys' fees.[111]  Ultimately, Dougherty received approximately $46.3 million from the Property's sale proceeds.[112]  Based on the evidence presented, the court finds that the Senior Loan balance as of February 7, 2012, was at least $43.2 million.

Debtor's Junior Loan balance on February 7, 2012, is more controversial.  The Objection states the Junior Loan balance was "in the approximate amount of $12 million."[113]  During the Patel Deposition on December 20, 2013, Vestin's counsel took the position that "[Debtor] was owed roughly 14 and a half [million] fully loaded with the interest fees," with which Patel agreed by saying "I would say, yeah, right there."[114]  Burr testified that Patel's $14.5 million estimate of the Junior Loan balance did not include several fees, but rather only principal and interest.[115]  Debtor Exhibit 15 states the outstanding amount of the Junior Loan on February 7, 2012, was $17,024,097.69.[116]  Debtor and Vestin supplemented Debtor Exhibit 15 at the Trial and offered Debtor Exhibit 15a, which shows the Junior Debt to have been $17,491,752.77.[117]

Based on the evidence presented, the court finds the Junior Loan amount was at least $14.5 million.  While the Objection states the balance to have been $12 million, Key correctly notes that $14.5 million is the amount that Debtor has "consistently used throughout the Debtor's

---

111    *Mar. 19 Tr.*, docket no. 620, at 13:10–11.

112    Debtor Exhibit 43 at 1; *Objection*, docket no. 513, ¶ 47(d).  *See supra* note 52.

113    *Objection*, docket no. 513, ¶ 47(b).  *See also Key Pre-Trial Br.*, docket no. 584, ¶ 13 n.2 (relying on the Objection when stating that Presidio owed $12 million for the Junior Loan).

114    Joint Exhibit 175 at 191:2–4.

115    *Mar. 19 Tr.*, docket no. 620, at 80:23–81:22.

116    Debtor Exhibit 15 at 1.  *See also Debtor Pre-Trial Br.*, docket no. 585, at 3 & n.10 (citing Joint Exhibit 175 at 221:11–222:18).

117    Debtor Exhibit 15a at 1–2.

entire bankruptcy case."[118] Moreover, an email from Jennifer Tsuneta, a Vestin employee, to Stubbs on January 6, 2012, showed the Junior Loan balance to be $14,387,343.75—an amount in line with Patel's $14.5 million estimate as of February 7, 2012.[119] Based on its continued use throughout the case, $14.5 million appears to be an accurate estimate of the Junior Note's balance of which all parties had sufficient notice.[120]

Accordingly, based on the foregoing findings, the Property was encumbered by, at a minimum, $57.7 million of debt between the $43.2 million Senior Loan and the $14.5 million Junior Loan. Having determined the liabilities side of the equation, the court turns now to whether Key has demonstrated the Property's value exceeded $57.7 million on February 7, 2012.

*2. Debtor's Schedules Are Assumed to Be an Admission as to the Property's Value*

Relevant to determining the value of the Property for the purposes of the TUFTA is whether Debtor's scheduled value for the Property of $65 million is a binding admission. Key argues the Schedules constitute a judicial admission that Debtor cannot contradict.[121] Specifically, Key argues this statement is an admission because the Schedules were signed under penalty of perjury,[122] based on a sophisticated appraisal,[123] relied upon by Debtor to prove Dougherty was adequately protected by an equity cushion,[124] and—most importantly—never

---

118    *Key Post-Trial Br.*, docket no. 624, ¶ 4 n.8 (citing Joint Exhibit 175 at 191:2–4; Joint Exhibit 163 at 141:25–142:1).

119    *Compare* Debtor Exhibit 158 at 1, *with* Joint Exhibit 175 at 191:2–4.

120    Key objected to Debtor's alleged "gamesmanship" and "trial by ambush" with Debtor Exhibits 15 and 15a. *See Key Post-Trial Br.*, docket no. 624, ¶ 4. Because the $14.5 million balance of the Junior Loan has been used consistently in the Case, Key can hardly claim surprise as it pertains to this lower balance.

121    *Id.* ¶ 1; *Key Resp. Br.*, docket no. 593, ¶¶ 3–5 & n.2.

122    *Key Post-Trial Br.*, docket no. 624, ¶ 8.

123    *Id.* ¶ 14.

124    *Id.* ¶ 8 n.14.

amended.[125] Key cites several cases in support[126] and argues against the alleged inequities of Debtor "hav[ing] it both ways" by arguing for a high or low value as necessary.[127]

In contrast, Debtor argues that the Schedules are not a binding admission,[128] that bankruptcy schedules are treated "with a different, more relaxed, view" as evidence rather than an admission,[129] or, alternatively, that Burr's testimony at the hearing on the Motion to Lift Stay on May 12, 2012, either effectively amended the Schedules or at least put Key on notice that Debtor was abandoning the $65 million appraisal.[130]

The overwhelming majority of courts, including courts in the Fifth Circuit, has held that "[s]tatements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admission."[131] For example, the debtor in *Larson* scheduled as valueless all unliquidated claims, which included the debtor's potential

---

125    *Id.*

126    *Key Resp. Br.*, docket no. 593, ¶ 3 (citing *AT&T Universal Card Servs. Corp. v. Duplante (In re Duplante)*, 215 B.R. 444, 447 n.8 (B.A.P. 9th Cir. 1997) ("Adopting a cavalier attitude toward the accuracy of the schedules and expecting the court and creditors to ferret out the truth is not acceptable conduct by debtors or their counsel."); *In re Presto*, 376 B.R. 554, 565 (Bankr. S.D. Tex. 2007); *In re Sissom*, 366 B.R. 677, 697 (Bankr. S.D. Tex. 2007)).

127    *Key Post-Trial Br.*, docket no. 624, ¶ 14 ("In order to discourage such parties from taking inconsistent positions and in order to encourage debtors to be serious about including truthful information in their Schedules, significant weight should therefore be placed on the Debtor's admission that the value of its real property was $65 million.").

128    *Debtor Post-Trial Br.*, docket no. 625, at 12.

129    *Debtor Resp. Br.*, docket no. 594, at 4 (quoting *In re Mon View Mining Co.*, 479 B.R. 670, 679–80 (Bankr. W.D. Pa. 2012)).

130    *Id.* at 3–4.

131    *In re Rollings*, 451 F. App'x 340, 348 (5th Cir. 2011) (quoting *In re Bohrer*, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001)); *Jacobson v. Ormsby (In re Jacobson)*, Adv. No. 04–5084, 2006 WL 2796672, at *17 (N.D. Tex. Sept. 26, 2006), *aff'd on other grounds*, No. 06–51460, 2007 WL 2141961 (5th Cir. July 26, 2007) (per curiam); *Larson v. Groos Bank, N.A.*, 204 B.R. 500, 501 (W.D. Tex. 1996) (collecting cases); *In re Presto*, 376 B.R. at 565; *In re Sissom*, 366 B.R. at 697. *See also* 4 COLLIER ON BANKRUPTCY ¶ 521.08[2][a] (Alan J. Resnick & Henry J. Sommer eds., 16th ed. rev. 2014); 2 BANKRUPTCY EVIDENCE MANUAL § 801:22 ¶¶ 1, 4 (Hon. Barry Russell ed., 2013).

---

claim against its lender.[132] There, the debtor never amended its schedules, thus the district court held that the admission was binding on the debtor and dismissed the debtor's subsequent suit against its lender.[133]

Despite this majority position, courts have nonetheless been sensitive to the doctrine of judicial admissions in bankruptcy cases, particularly regarding value.[134] As a result, most courts have allowed debtors to withdraw or amend schedules as necessary.[135] Indeed, the Rules support liberal amendments to schedules.[136] A debtor's failure to amend its schedules may cause a judicial admission that could bind the debtor and prevent it from later contradicting the schedules.[137] For example, in *Presto*, the debtor argued that he did not owe a scheduled debt.[138] The court held that the debtor's unamended schedules established the debt's validity and estopped the debtor from presenting contrary evidence.[139] Likewise, the court in *Sissom* prevented the debtor from asserting solvency where, after five amendments, his schedules showed him to be insolvent.[140]

Considering this Fifth Circuit precedent, Debtor's unamended Schedules are likely admissions as to value. Debtor argues that admissions as to value, in particular, should be

---

132 204 B.R. at 501–02.

133 *Id.* The debtor in *Larson* argued he could have reopened his bankruptcy case so as to amend his schedules to reflect a value for the lawsuit, thus alleviating any concerns about admissions. *Id.* at 503 n.3. Because the debtor had never done so, the district court declined to consider the hypothetical argument. *Id.*

134 *See* 4 COLLIER ON BANKRUPTCY ¶ 521.08[2][a] & n.20.

135 *Id.*

136 *See* FED. R. BANKR. P. 1007 (allowing a debtor to amend a voluntary petition, list, schedule, or statement as a matter of course at any time before case closure).

137 *Jacobson*, 2006 WL 2796672, at *17; *In re Presto*, 376 B.R. at 565; *In re Sissom*, 366 B.R. at 697.

138 376 B.R. at 565.

139 *Id.*

140 366 B.R. at 697.

limited to mere persuasive evidence because value is a malleable estimate.[141] For support, Debtor cites several cases drawn from the consumer context.[142]

Alternatively, Debtor argues that its later change of position in subsequent formal pleadings negates, or at least undermines the persuasive value of, any judicial admission of value.[143] This argument appears to be an extension of the doctrine that a subsequently amended pleading may be considered as evidence, but not as a judicial admission.[144] Key argues Debtor's reliance on a subsequent amendment by contradiction requires the court to overlook other instances in the case after obtaining the $55 million appraisal when Debtor argued in favor of the $65 million appraisal. Specifically, Debtor relied on the higher valuation when opposing Dougherty's Motion to Dismiss and Motion to Lift Stay, arguing that an equity cushion existed sufficient to provide Dougherty adequate protection.[145] The doctrine of judicial estoppel prevents a party from changing a factual or legal position on which it previously prevailed to the unfair detriment of its adversary.[146] This subsequent reversal in position tends to support the

---

141    *See Debtor Resp. Br.*, docket no. 594, at 3 & n.11.

142    *Debtor Resp. Br.*, docket no. 594, at 3 n.11 (citing *Toal v. Chase Home Fin. LLC (In re Toal)*, No. 10–8613, 2011 WL 3607911, at *3–4 (Bankr. E.D.N.Y. Aug. 15, 2011) (refusing to consider an individual debtor's own valuation of his homestead as binding because it diverged considerably from two subsequent appraisals); *In re Boggess*, 105 B.R. 470, 473–74 (Bankr. S.D. Ill. 1989) (relying upon a subsequent appraisal of an individual debtor's homestead rather than the debtor's scheduled estimate)).

143    *Debtor Post-Trial Br.*, docket no. 625, at 9–10. *See also In re Somerset Apts., Ltd*, No. 8:06 CV 678, 2007 WL 552209, at *4 (D. Neb. Feb. 21, 2007) (holding that a debtor's statement in a claim objection that was clearly inconsistent with disclosure statement "was sufficient to remove the debtor's prior inconsistent statements from the realm of judicial admissions and to permit the bankruptcy court to receive evidence on the issue of liability").

144    *See In re Kaskel*, 269 B.R. 709, 715–16 (Bankr. D. Idaho 2001).

145    Joint Exhibit 142 ¶ 42 ("Moreover, Dougherty does not dispute, and indeed cannot dispute, that there is significant equity in the Property. An appraisal of the Property, which Dougherty ordered, indicates a value of no less than $65.6 million."). Debtor's current departure from the $65 million number is not its first. *See* Joint Exhibit 151 ¶ 45 (Debtor arguing it was insolvent for the purpose of pleading a constructive fraudulent transfer against Richfield).

146    *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 377–78 (3rd Cir. 2007).

---

court declining to exercise its discretion to treat Debtor's later changes in position as to value as effective amendments to the Schedules.

Even assuming that Debtor is tied to the Schedules as an admission, the court is not so bound.[147]  Indeed, the court has already departed from the $65 million valuation, indicating concern in the Prior Opinion that "the difference between the September [$65 million] Appraisal and the March [$55 million] Appraisal supports an inference that the Property has gone down in value, not up."[148]  Accordingly, the court must consider whether Key has presented sufficient evidence to peg the Property's value at more than $57.7 million, the amount the court has already determined to have been the amount of debt encumbering the Property on February 7, 2012.

### 3. The Fair Market Value of the Property Was Equal to or Less Than the Encumbrances

Having established that Debtor's assumed admission does not bind the court to the value in the Schedules, the court now turns to address the value of the Property.

#### a. Fair Market Value Is the Applicable Legal Standard for Value

Key argues in its briefs that "fair market value," and not "liquidation value," is the proper standard to apply and that any reliance on *BFP v. Resolution Trust Corp.*[149] is improper.[150]  *BFP* and its progeny stand for the proposition that "reasonably equivalent value" means "liquidation value" rather than "fair market value" in the context of an otherwise lawful mortgage foreclosure sale of real estate.[151]  The Supreme Court reiterated the scope of its decision, saying: "We

---

147    It is at least arguable that Debtor, in its capacity as a debtor in possession, is not bound to the Schedules or that Vestin, as a separate party, is not bound.  *See Debtor Post-Trial Br.*, docket no. 625, at 12 n.78.  Nonetheless, even assuming that Debtor cannot contradict the $65 million appraisal and relying instead on Key's evidence and Joint Exhibits, the outcome remains unchanged.  *See supra* notes 13 and 106.

148    *In re 1701 Commerce*, 477 B.R. at 660.

149    511 U.S. 531 (1994).

150    *Key Post-Trial Br.*, docket no. 624, ¶ 9; *Key Response Br.*, docket no. 593, ¶ 6 n.7.

151    *BFP*, 511 U.S. at 537–38.

emphasize that our opinion today covers *only* mortgage foreclosure of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different."[152] Because no foreclosure sale occurred here, Key argues *BFP* is inapposite and that a fair market value standard should govern.

The court agrees—but with the caveat that Debtor having posted the Property for foreclosure still affects fair market value negatively. Fair market value means the "value that a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller."[153] Within two months before the alleged transfer, Presidio had defaulted on both Dougherty's and Debtor's liens and Debtor had filed its *Notice of Trustee's Sale*. Debtor posted the Property for foreclosure on January 17, 2012, and Presidio and Dougherty were litigating to stop the foreclosure in state court.[154] The Deed in Lieu Agreement was consummated on the eve of the foreclosure sale after negotiations between the lenders had faltered and when time constraints were critical.[155] While *BFP* does not dictate that reasonably equivalent value equals what value the Property may have garnered at a foreclosure sale hours later, the Supreme Court's observations, with slight alteration, are relevant because "[n]o one would pay as much to own [distressed] property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques."[156]

---

152     *Id.* at 537 n.3 (emphasis added).

153     *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 892 (Bankr. W.D. Tex. 1992).

154     *In re 1701 Commerce*, 477 B.R. at 655; *see supra* notes 24–26.

155     *See* Joint Exhibit 175 at 94:4–7.

156     *See BFP*, 511 U.S. at 539.

### b. Evidence of Fair Market Value

With this observation in mind, the court turns to determining the fair market value of the Property as of February 7, 2012. For the purposes of determining whether an "asset" was transferred, the court need only determine whether fair market value was greater than $57.7 million, the amount already determined to have been the total debt owed on the Junior and Senior Loans, collectively. As will be discussed, the evidence presented at the Trial supports that the fair market value was equal to or less than $57.7 million, thus no "asset" was transferred.

At the onset, the court notes that the ownership of the TOT Agreement was settled before February 7, 2012, thus any testimony about muddled ownership negatively affecting value is irrelevant.[157] The same is not true of the One-Percent Interest because Presidio's one-half interest in the One-Percent Interest predated and survived the Deed in Lieu Agreement.[158]

Courts traditionally use three methods to value the fair market value of real estate: (1) the market data or comparable sales approach; (2) the income approach; or (3) the cost or replacement value approach.[159] Real estate appraisers rely on all three methods, but, to some extent, multiple appraisals on a property are "only educated estimates in the absence of one or more buyers, ready, willing and able to purchase the [property]."[160] Several purchasers submitted letters of intent to purchase the property following the Deed in Lieu Agreement. Some of these offers were submitted in the period between the Deed in Lieu Agreement and the Petition Date, including: (1) Wheelock Street Capital, a Richfield affiliate, for $48 million, dated

---

157 *See Feb. 11 Tr.*, docket no. 609, at 39:22–40:14 (Lewis testifying questions about Debtor's ownership of the TOT Agreement negatively affected value).

158 *Id.* at 40:15–23.

159 *See* WILLIAM L. VENTOLO, JR. & MARTHA R. WILLIAMS, FUNDAMENTALS OF REAL ESTATE APPRAISAL 67–71 (8th ed. 2001).

160 *In re Pullman Const. Indus. Inc.*, 107 B.R. 909, 932 (Bankr. N.D. Ill. 1989).

February 23, 2012 (the "Wheelock Offer")[161] and (2) AHI Pursuit Partnership, LP, an affiliate of Aimbridge Hospitality, L.P., for $50 million (which valued separately the Property for $45 million and the TOT Agreement for $5 million), dated March 12, 2012 (the "Aimbridge Offer").[162]  Other valuations were received post-petition, including: (1) an offer from 1701 Commerce Acquisitions for $51 million, dated May 11, 2012;[163] (2) Debtor's counterproposal to 1701 Commerce Acquisitions for $56.3 million, dated June 6, 2012;[164] and (3) the Prism Asset Purchase Agreement for $55 million, dated September 24, 2012.[165]  All of these offers and the counterproposal were submitted within one year of the Deed in Lieu Agreement.  1701 Commerce Acquisitions obtained court approval to purchase the Property for $49.3 million almost exactly one year after the DILA and closed the transaction five months later.[166]

The Fifth Circuit has repeatedly stated that "[i]t is well settled that the admissibility of comparable sales . . . is a matter within the peculiar discretion of the trial judge."[167]  Based on the evidence presented at the Trial, the court is satisfied that these offers came from sophisticated operators who could be reasonably expected to have investigated the Property's value and a representative of whom Key could have called to testify had it desired to test their knowledge under cross-examination.[168]

---

161    Joint Exhibit 27 at 2.

162    Joint Exhibit 30 at 2.

163    Joint Exhibit 33 at 2.

164    Joint Exhibit 34 at 2.

165    Joint Exhibit 35 at 6.

166    Joint Exhibit 41 at 2–3.

167    *Levy v. United States*, 402 F. App'x 979, 983 (5th Cir. 2010) (quoting *United States v. Certain Land in the City of Fort Worth*, 414 F.2d 1029, 1031 (5th Cir. 1969)).

168    *See id.* at 982.

Key objects to the use of these offers as evidence of value on numerous grounds. First, Key argues that under the Fifth Circuit's decision in *Levy* limited the use of offers as evidence of market value to situations "when [the offers] were part of ongoing negotiations resulting in a contract."[169] The *Levy* court did not limit the use of offers as evidence to *only* when a contract resulted, but rather inferred that the completed contract strengthened the evidentiary value of the offer.[170] Here, the offers by Prism and 1701 Commerce Acquisition both resulted in contracts subsequently approved by the court.[171] Thus, even if the Wheelock and Ambridge Offers are excluded, two other offers indicate the Property value was worth $55 million or less. Second, to the extent offers are considered, Key argues that a sophisticated buyer would offer less than it intended to pay to purchase the Property.[172] Such a "negotiation premium" is common sense, but the analysis cuts both ways. Discoveries during the due diligence period may adversely affect value, such as was the case with Prism withdrawing its $55 million offer based on due diligence developments and with 1701 Commerce Acquisitions's offer of $51 million decreasing to the final sale price of $49.3 million.[173]

Finally, Key objects to the use of the specific offers at issue on relevance grounds, arguing that "the relevant time period . . . is February 7, 2012" and that offers received after that date were too attenuated due to changed circumstances or elapsed time.[174] The court disagrees. Depending on the market, real estate valuations often consider comparable transactions within

---

169     *Key Post-Trial Br.*, docket no. 624, ¶ 11 (quoting *Levy*, 402 F. App'x at 982).

170     *Levy*, 402 F. App'x at 982.

171     *See* Joint Exhibits 37, 41.

172     *Key Post-Trial Br.*, docket no. 624, ¶ 11 n.24.

173     *Compare* Joint Exhibit 33 at 2, *with* Joint Exhibit 35 at 6.

174     *Feb. 11 Tr.*, docket no. 607, at 19:15–19.

six to twelve months of the valuation date.[175] The September Appraisal of $65 million on which Key relies heavily uses comparable transactions that date up to seven months away from the valuation date of September 1, 2011.[176] The Fifth Circuit has held that trial judges did not abuse their discretion when allowing as evidence of value comparable sales as remote as two or even three and a half years from the valuation date.[177] Moreover, Dougherty obtained that appraisal *before* Presidio defaulted on the Junior and Senior Loans. So, arguably, the changed circumstances between September 1, 2011, and February 7, 2012, undermine the relevance of the $65 million September Appraisal.[178] Nonetheless, the court will consider the September Appraisal alongside the market-based offers received after the Deed in Lieu Agreement.

For the same reasons, the court will also consider the eventual sales price of $49.3 million. As with elapsed time, that the sale was conducted through a bankruptcy likewise does detract from the eventual sales price indicating value. With several bidders pursuing an asset, there is no reason to believe a sale through bankruptcy would not achieve fair market value.

As an alternative to the $65 million valuation, Key argues in its post-petition brief that the Property value could be calculated as $59,970,942.74 based on Debtor's evidence.[179] Specifically, Key's argument starts with its cross-examination of Lewis, Debtor's valuation expert. Lewis stated his $54 million valuation assumed a transaction of "*fee simple*, non-

---

175 VENTOLO & WILLIAMS, *supra* note 159, at 127 ("Within a normal market, sales no more than six months before the date of appraisal generally are acceptable. In a slow-moving market, the appraiser may have to refer to comparable sales from as long as a year earlier.").

176 Key Exhibit 156 at V-3.

177 *Levy*, 402 F. App'x at 983; *Jayson v. United States*, 294 F.2d 808, 810 (5th Cir. 1961).

178 *In re 1701 Commerce*, 477 B.R. at 660 ("[T]he difference between the September Appraisal and the March Appraisal supports an inference that the Property has gone down in value, not up.").

179 *Key Post-Trial Br.*, docket no. 624, ¶ 13.

distressed market value."[180]   Because "fee simple" includes only an interest in real, and not personal, property, Key then aggregates Presidio's current assets as of January 31, 2012, ($1,423,835) and depreciated book value of its furniture, fixtures, and equipment ($4,547,107.14) to reach its approximately $60 million alternative Property value.[181]

Key's method is flawed for two reasons.  First, although Key extrapolates its aggregate number from Lewis's testimony about a "fee simple" transaction, Lewis's accompanying expert report (the "Lewis Report") preempts such analysis.  For instance, the sentence immediately following the $55 million valuation in the cover letter attached to the Lewis Report states: "The opinion of value includes the land, the improvements thereto, *and* the contributory value of the furniture, fixtures, and equipment."[182]   Later, the Lewis Report restates this assumption, saying: "The interest appraised is the fee simple estate, *including* the contributory value of the land, furniture, fixtures and equipment."[183]   Second, the income-capitalization approach necessarily incorporates the value of the assets necessary to generate the income—that is, the current assets and the furniture, fixtures, and equipment.  Without these assets, the Property would not produce the income necessary to support the valuation.   The Lewis Report utilized the direct capitalization and discounted cash flow methods to capitalize projected income.[184]   Using this approach, the discounted cash flow analysis dictated the rounded net present value of the Property to be $55 million, which resulted in direct capitalization rates corresponding with the

---

180     *Id.* (quoting *Feb. 11 Tr.*, docket no. 607, at 46:22–47:4) (emphasis added by Key).  Key uses Lewis's low-end estimate of $54 million, rather than his higher, risk-adjusted average of $55 million.  *See* Joint Exhibit 32 at 52 (Bates no. 8213).  This distinction is without a difference, but the court will follow Key's analysis for clarity.

181     *Key Post-Trial Br.*, docket no. 624, ¶ 13 (citing Joint Exhibits 53 and 143).

182     Joint Exhibit 32 at iii (Bates no. 8149) (emphasis added).  The $65 million September Appraisal contains nearly identical qualifying language.  Key Exhibit 156 at i.

183     *Id.* at 3 (Bates no. 8164) (emphasis added).

184     Joint Exhibit 32 at 30–48 (Bates nos. 8191–8209).

investor expectations presented in the Lewis Report.[185] For both of these reasons, Key's build-up analysis is flawed and miscounts Presidio's assets.

Likewise, Key argues that Lewis equivocated regarding capital improvements, indicating that the amounts escrowed for Property improvements at the eventual sale of the Property should be added to Lewis's valuation.[186] The Lewis Report made no allocation for up-front capital improvements, but instead only incorporated an expense of four percent of revenue each operating period for furniture, fixtures, and equipment replacement reserves.[187] But these amounts, as well as Lewis's observations of the Property's condition, are separate from the requirements of the PIP Agreement that Starwood would impose on a new owner.[188] Lewis testified that such improvement programs "[are] not, as it happens, terribly unusual when branded hotels transfer."[189] As a result, the escrow for the PIP Agreement is relevant, and conflating Lewis's statements about reserve replacements and the PIP Agreement is in error.

Accordingly, the evidence of value includes: (1) the competing appraisals of $55 million and $65 million, both of which include the approximately $6.3 million TOT Agreement; (2) multiple offers, counter-offers, and executed contracts ranging from $48 million to $56.3 million; (3) the final sales price for the Property of $49.3 million; (4) trailing history of the Property's financial performance; and (5) testimony regarding Debtor's foreclosure sale, the One-Percent Interest, the PIP Agreement, and Presidio's defaults under multiple loan obligations.

---

185    *Id.* at 47–48 (Bates nos. 8208–09).

186    *Key Post-Trial Br.*, docket no. 624, ¶ 15.

187    Joint Exhibit 40 (Bates no. 8201) ("[T]he subject property's facilities were recently renovated and the property's overall condition is assumed to be good.").

188    *See* Joint Exhibit 38.

189    *Feb. 11 Tr.*, docket no. 607, at 16:19–23.

### 4. Because Debt Exceeded Fair Market Value, No "Asset" Was Transferred

Having considered the evidence presented as to value, the court concludes that the Property's value as of February 7, 2012, was equal to or less than $57.7 million.[190] As a result, the Junior and Senior Loan amounts exceeded the Property's value, meaning no unencumbered "asset" within the meaning of the TUFTA was transferred by the Deed in Lieu Agreement. Accordingly, Key cannot assert the Claim against the estate because the Deed in Lieu Agreement does not constitute a fraudulent transfer as a matter of law.

### C. Even if Presidio Could Have Transferred an "Asset," the Transfer Was Not Fraudulent

Even assuming that an "asset" could have been transferred, meaning that the TUFTA would apply to the Deed in Lieu Agreement, the court finds that the transfer was not fraudulent. Under Texas law, a fraudulent transfer may be made with actual fraud or constructive fraud.[191] A transfer is made with actual fraud if made "with actual intent to hinder, delay, or defraud any creditor of the debtor."[192] The focus is whether the debtor/transferor acted with such intent in transferring an asset.[193] Direct evidence of actual fraud is seldom available, so Texas law allows a plaintiff to rely on circumstantial evidence to prove actual intent.[194] Section 24.005(b) of the

---

190    Indeed, the value was likely far less than this figure—more likely, around the $49.3 million sale price ultimately achieved in bankruptcy. Nonetheless, the court need not make such an exact determination of value because a finding that the Property was worth equal to or less than the amount of the Junior and Senior Loans is sufficient for this analysis.

191    TEX. BUS. & COM. CODE § 24.005(a)(1)–(2). Key has challenged the Deed in Lieu Agreement only on actual fraud grounds. Joint Exhibit 70 at 4–5; Joint Exhibit 71 at 7; *Debtor Post-Trial Br.*, docket no. 625, at 19 n.89. Nonetheless, the court notes that no constructive fraudulent transfer occurred because Presidio received reasonably equivalent value for the Property under the Deed in Lieu Agreement. *See infra* Section II.C.8.

192    TEX. BUS. & COM. CODE § 24.005(a)(1).

193    *S.E.C. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) ("[T]he transferees' knowing participation is irrelevant under the statute for purposes of establishing the premise of (as opposed to liability for) a fraudulent transfer. . . . The statute requires only a finding of fraudulent intent on the part of the 'debtor' . . . .") (quoting *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006)) (internal quotations and citations omitted).

194    *In re Pace*, 456 B.R. 253, 266 (Bankr. W.D. Tex. 2011). Here, the only direct evidence concerning actual fraud is the testimony of Patel, Stubbs, and Burr that the Deed in Lieu Agreement was *not* intended to hinder,

---

Texas Business and Commerce Code lists eleven factors or "badges of fraud" to consider, including whether:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[195]

This list is not exhaustive,[196] and a court may also consider other suspicious facts suggesting that a transfer was made with actual fraudulent intent.[197]    A similar test is used under section 548(a)(1)(A) of the Code.[198]  The court will address these factors in order.

---

delay, or defraud creditors.  Joint Exhibit 175 at 193:5–12, 196:6–15 (Patel); *Feb. 11 Tr.*, docket no. 607, at 88:15–17 (Stubbs); *Mar. 19 Tr.*, docket no. 620, at 59:1–12 (Burr).

195    TEX. BUS. & COM. CODE § 24.005(b)(1)–(11).

196    *Hahn v. Love*, 321 S.W.3d 517, 525–26 (Tex. App.—Houston [1st District] 2009, pet. denied) (stating that the factors under section 24.005(b) are non-exclusive); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.04[1][b] n.16 (Alan J. Resnick & Henry J. Sommer eds., 16th ed. rev. 2014) ("As the varieties of fraud are limited only by the imaginations of the malign and duplicitous, no definitive list of badges exists.").

197    *See, e.g.*, *Faulkner v. Kornman (In re Heritage Org., L.L.C.)*, 413 B.R. 438, 485 (Bankr. N.D. Tex. 2009) (considering "back-of-an-envelope" calculations and "unfair or fraudulent conduct by omission . . . with . . . clients and prospective clients" as additional badges of fraud); *ASARCO LLC v. Am.'s Mining Corp.*, 396 B.R. 278, 370–71 (S.D. Tex. 2008) (considering numerous other additional "badges" of fraud, including that the alleged bad actor wanted the debtor's "crown jewel" for itself); *In re Sissom*, 366 B.R. 677, 700–01 (Bankr. S.D. Tex. 2007) (finding that a "pattern of sharp dealing" prepetition supported a finding of actual fraudulent intent); *see also* TEX. BUS. & COM. CODE § 24.005(b) (stating that the eleven badges of fraud are "among other factors").

198    Section 24.005(a)(1) and section 548(a)(1)(A) of the Code adopt similar standards for establishing an actual intent to hinder, delay, or defraud, so decisions under section 548(a)(1)(A) may therefore be considered when determining decisions under section 24.005(a)(1). *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 572 (Bankr. N.D. Cal. 1994) ("Unless otherwise specified, common-law authorities and case-law dealing with the [Uniform Fraudulent Conveyances Act], [Uniform Fraudulent Transfer Act], Bankruptcy Act of 1898[,] or the Bankruptcy Code may be cross-referenced whatever the statutory basis of the action at bar.").  Moreover, the court notes that the same test applies under sections 522(o) and 727(a)(2) of the Code to determine whether a debtor acted with intent to hinder, defraud, or delay creditors.  *See In re Ellis*, 454 B.R. 404, 410–11 (Bankr. S.D. Tex. 2011).

---

### 1. The Property Was Not Transferred to an Insider of Presidio

Key acknowledges the Property was not transferred to an insider of Presidio, but argues that certain insiders of Presidio benefitted from the Deed in Lieu Agreement.[199] Specifically, Key argues that Patel, via PHM, received the upside of any future sale, as well as payment for "illusory 'asset management services,'" and that Presidio's insiders benefitted from the release of their personal guarantor obligations to Debtor.[200] Debtor responds by arguing that Debtor, the transferee, was not an insider of Presido.[201]

The court agrees that the Property was not transferred to an insider. While an affiliate of an insider would have potentially benefitted under the Deed in Lieu Agreement, an agreement conveying encumbered property back to a creditor in lieu of foreclosure is a standard arm's-length remedy for a secured creditor. Because the transfer was not to an insider, the badge weighs against a finding of actual intent.

### 2. Presidio Did Not Retain Possession or Control of the Property

Key argues Debtor retained control of the Property after the Deed in Lieu Agreement based on Patel's connection to PHM and Presidio. Again, however, Key is conflating Presidio and PHM by relying on Patel's dual roles as a principal with each entity. PHM, not Presidio, was authorized to market and sell the Property under the Deed in Lieu Agreement.[202] Somewhat troubling evidence regarding control is Patel's letter to Dougherty dated February 10, 2012—sent on "Presidio Companies" letterhead—in which he states "*We* will retain exclusive control of

---

199  *Key Pre-Trial Br.*, docket no. 584, ¶ 19; *Key Post-Trial Br.*, docket no. 624, ¶ 21.

200  *Key Pre-Trial Br.*, docket no. 584, ¶ 19.  *See* Joint Exhibit 56 at ¶ 3.

201  *Debtor Pre-Trial Br.*, docket no. 585, at 22–23.

202  Joint Exhibit 56 ¶¶ 5.1, 5.4.

the operations of the [Property] for a period of at least six months."[203]  Nonetheless, PHM and

Presidio are separate legal entities, so this badge weighs against a finding of actual intent.

### 3. Neither Presidio Nor Debtor Concealed the Deed in Lieu Agreement

Key argues that Debtor and Presidio conspired to conceal the Deed in Lieu Agreement,

thus indicating intent to hide the transferred ownership of the Property.[204]  Key's contentions

have some merit.  Stubbs testified that the similarity between Debtor's and Presidio's legal

names was for "ease of reference."[205]  But other evidence suggests the purpose was to prevent

potential third-party purchasers from believing that the Property was distressed so as to buttress

the market for purchase offers.  Patel testified it was for this purpose that PHM acted as asset

managers of the Property after the Deed in Lieu Agreement.[206]  Also suspect is Vestin's

misstatement in its March 16, 2012, Form 10-K, in which Vestin stated that "the former

borrower" (Presidio) rather than PHM would benefit under the Deed in Lieu Agreement.[207]

Nonetheless, other evidence exists to offset these concerns.  For instance, the availability

of the full Deed in Lieu Agreement as part of Vestin's March 16, 2012, Form 10-K was made

clear at the Trial, thus undermining Key's assertion that Vestin concealed the DILA after

misstating its terms in the Form 10-K text.[208]  Moreover, despite paragraph 7.12 of the DILA

requiring confidentiality of the terms of the agreement, Patel sent a full copy of the Deed in Lieu

---

203    Joint Exhibit 57 at 2 (emphasis added).

204    *Key Pre-Trial Br.*, docket no. 584, ¶ 19; *Key Post-Trial Br.*, docket no. 624, ¶ 21.

205    *Feb. 11 Tr.*, docket no. 607, 112:22–114:4.

206    Exhibit 175 at 102:17–103:9.

207    *Key Pre-Trial Br.*, docket no. 584, ¶ 14 n.4; *supra* note 41.  Also possible is that Debtor misunderstood that PHM was not the former borrower.  *See Feb. 11 Tr.*, docket no. 607, 138:2–5, 139:16–140:5.

208    *Feb. 11 Tr.*, docket no. 607, 155:10–158:9.

Agreement to Dougherty by letter two days after execution,[209] and Vestin attached a full copy to its public filing. Patel responded to Walker by email within a week of executing the DILA, thus providing Key notice of the Deed in Lieu Agreement.[210] Debtor also recorded the deed consummating the Deed in Lieu Agreement the day after its execution.[211] Finally, as the DILA was a last option and executed on the eve of foreclosure, the notice understandably came after, rather than before, executing the agreement. While the evidence indicates Presidio may have been less than enthusiastic about proclaiming the Deed in Lieu Agreement, the court does not conclude that Debtor concealed the alleged transfer. This badge does not favor actual intent.

### 4. Presidio Had Been Sued or Threatened With Suit Before the DILA

This badge is present here. Presidio had defaulted on three notes (*i.e.*, those held by Dougherty, Debtor, and Key),[212] and each counter-party had made demand for payment before February 7, 2012.[213] Key's and Dougherty's demands for payment before the alleged transfer were sufficient threats of suit for the purposes of fraud evidence.[214] Even more so, Debtor had proceeded with foreclosing on its security interest in the Property and had scheduled a sheriff's

---

209    Joint Exhibit 56 at 3–18. Key argues in its briefs that Presidio intended to defraud Dougherty by the Deed in Lieu Agreement. *Key Pre-Trial Br.*, docket no. 584, ¶ 18; *Key Resp. Br.*, docket no. 593, ¶ 13. The almost immediate notice of the DILA provided to Dougherty appears to cut against this conclusion.

210    Joint Exhibit 67 at 1–2.

211    Joint Exhibit 58. *See In re Schmidt*, No. 05-84993-RCM-7, 2006 WL 6544160, at *8 (Bankr. N.D. Tex. Jan. 6, 2006) (holding that a transfer of property pursuant to a prenuptial agreement was neither fraudulent nor concealed when, "[w]hile the agreement was not recorded, the titles to the real estate interests in question were taken in [the transferee's] name in both instances and were a matter of public record").

212    *See supra* notes 21 and 60.

213    Joint Exhibit 105 (Dougherty's default and demand letter, dated January 5, 2012); Joint Exhibit 22 (Debtor's default notice to Presidio, dated January 4, 2012); Joint Exhibit 66 (Key's demand letter to Presidio, dated January 10, 2012).

214    *Faulkner*, 413 B.R. at 485; *Krol v. Unglaub (In re Unglaub)*, 332 B.R. 303, 318 (Bankr. N.D. Ill. 2005); *see also Dime Sav. Bank of N.Y., FSB v. Butler*, No. CV-930349247S, 1997 WL 112776, at *2 (Conn. Super. Ct. Feb. 21, 1997) (holding that a debtor who had defaulted on three mortgages "was certainly 'threatened with suit'" for purposes of proving actual intent under Connecticut's Uniform Fraudulent Transfer Act).

sale to have been conducted only hours after Presidio executed the Deed in Lieu Agreement.[215] Presidio was also involved in litigation in state court to stop this foreclosure[216] and would be sued by Key on its security interest shortly after the Deed in Lieu Agreement was executed.[217] Accordingly, this badge weighs in favor of finding actual intent existed.

### 5. The Deed in Lieu Agreement Disposed of Substantially All of Presidio's Assets

This badge is present here. Amid disagreement about whether the Deed in Lieu Agreement transferred the TOT Agreement,[218] the court concluded Presidio kept possession of the TOT Agreement after the Deed in Lieu Agreement.[219] In addition to the TOT Agreement, Presidio still owned a fifty-percent share of the One-Percent Interest, which was worth one half of one percent of the eventual gross sales price. Debtor argued that the value of the TOT Agreement and the One-Percent Interest exceeded any *equity* transferred in the Property.[220] But the test is for the transferred assets, not equity. The relevant figure is the market value of the Property at the time of the transfer. Although the court has previously determined this amount to be equal to or less than $57.7 million, even the most conservative estimates of the Property's value are still six or seven times the combined value of Presidio's remaining assets. As a result,

---

215    *Supra* notes 24–26.

216    *In re 1701 Commerce*, 477 B.R. at 655–56.

217    Joint Exhibit 68 at 1–2.

218    *Compare Mar. 19 Tr.*, docket no. 620, at 98:20–23 ("[Q:] So . . . was it Vestin's understanding that it was receiving all of Presidio's assets, including the [TOT Agreement]? [A:] Yes."), *and Disclosure Statement*, docket no. 523, at 14 ("At the time the Debtor acquired the [Property], it also believed that it acquired [the TOT Agreement]."), *with* Joint Exhibit 175 at 161:23–162:6 (Patel testifying Presidio kept the TOT Agreement), *and* Joint Exhibit 46 ¶ 11 ("Presidio has not executed any agreement transferring the TOT Agreement or any rights thereunder to [Debtor].").

219    Debtor Exhibit 47 at 4:21–23 (transcript of the court's bench ruling that the DILA "did not result in the transfer of the TOT Agreement to the Debtor").

220    *Debtor Pre-Trial Br.*, docket no. 585, at 31–32.

Presidio transferred substantially all of its assets by the DILA, so this badge favors a finding of actual fraudulent intent.

### 6. Presidio Did Not Abscond With the Property

Neither party alleges that this badge is relevant in the Case.

### 7. Presidio Did Not Remove or Conceal Assets

Although the situation involving Presidio's retained ownership of the TOT Agreement could arguably implicate this badge, neither party alleges that Presidio concealed assets. Key alleges Presidio concealed the Deed in Lieu Agreement, but this allegation has already been addressed. As a result, this badge does not favor a finding of actual intent.

### 8. The Deed in Lieu Agreement Provided Reasonably Equivalent Value

Presidio received reasonably equivalent value under the Deed in Lieu Agreement, thus this badge weighs against a finding of actual intent. Of course, reasonably equivalent value alone is insufficient to disprove an actual intent to hinder, delay, or defraud creditors.[221] Nonetheless, the court considers this factor particularly relevant to analyzing this matter.

Section 24.005(a) of the TUFTA defines "value" by stating "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ."[222] "Reasonably equivalent value" is not limited to a set amount for "fair market value," but rather "includes, without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in

---

221 *E.g., Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) ("[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.") (quoting *McCombs v. Ellison (In re McCombs)*, 30 F.3d 310, 328 (2d Cir. 1994)); *ASARCO*, 396 B.R. at 364, 394 (holding that a transfer was made with an actual intent to hinder, defraud, and delay creditors despite conveying reasonably equivalent value).

222 TEX. BUS. & COM. CODE § 24.004(a).

an arm's[-]length transaction."[223]   So, by definition, reasonably equivalent value encompasses a range of values that may include a reasonable percentage above or below a singular, hypothetical "fair market value."[224]   As a result, the debtor need not receive a dollar-for-dollar benefit, but rather a benefit within the range of an arm's-length transaction.

Whether the debtor in an alleged fraudulent transfer received reasonably equivalent value logically makes sense to be a critical factor to consider.   A creditor's concern after a transfer of secured assets is whether the estate was diminished.   A debtor receiving reasonably equivalent value in a transaction serves this interest by either replacing the collateral with new (often liquidated) collateral or removing an obligation in tandem with the value depleted.

Here, the court concludes that Presidio received reasonably equivalent value for the Property.   Even assuming that the Property was worth more than the Junior and Senior Loans the value Debtor received here was the removal of debts totaling $57.7 million.   The court concludes that this amount falls above or within the range of hypothetical sales prices that would have constituted reasonably equivalent value.   Accordingly, this badge weighs against a finding of actual intent.

---

223     *Id.* § 24.004(d).

224     Before the Supreme Court's decision in *BFP*, the Fifth Circuit had noted in another case that no court appeared to have approved a transfer for less than seventy percent of the market value of the property.   *Durrett v. Wash. Nat. Ins. Co.*, 621 F.2d 201, 203 (5th Cir. 1980) (interpreting "fair equivalent" value under section 67(d) of the Bankruptcy Act, which is analogous to "reasonably equivalent value" under section 548(a)(2) of the Code), *abrogated by BFP*, 511 U.S. at 536.   Some courts had interpreted the "*Durrett* rule" to mean that anything more than seventy percent of the real property's market value constituted reasonably equivalent value.   *BFP*, 511 U.S. at 535–36 (citing cases).   Although the Supreme Court's decision in *BFP* abrogated *Durrett*, a large percentage swing may nonetheless constitute reasonably equivalent value depending on the type of asset conveyed and the relevant market.

*9. Presidio Was Insolvent After the Deed in Lieu Agreement*

Key argues the Deed in Lieu Agreement left Presidio insolvent both because (1) Presidio was undercapitalized compared to its continued liability to Key and Dougherty and (2) Presidio was presumed insolvent for not generally paying its debts as they came due.[225] Presidio remained liable to Dougherty for the Senior Loan after the Deed in Lieu Agreement.[226] Moreover, as discussed, Debtor did not expressly assume any of Presidio's debts.[227] Accordingly, Presidio was insolvent based on these two debts, which alone totaled over $45 million. Although Presidio's remaining assets were not inconsequential, the remaining debts far exceeded the remaining assets. This badge favors a finding of actual intent.

*10. The DILA Did Not Occur Before or Shortly After a Substantial Debt Was Incurred*

Neither party alleges the relevance of this badge.

*11. Debtor's Eventual Sale to Presidio's Affiliate Does Not Indicate Fraud*

Key argues the final badge—that debtor transferred property to a lienor who subsequently transferred the property to the debtor's insider—is present here, saying:

> In exchange for the transfer of the [Property] to the Debtor (who, as Vestin's assignee, was a lienor), the right to receive what was believed to be $7 million of equity that remained after the satisfaction of the Dougherty and Vestin loans was divided between Vestin and PHM, who was an affiliate of [Presidio] (and an insider, pursuant to the definition set forth in Section 24.002(7)(D)).[228]

This argument, again, rests on a $65 million Property value and also misconstrues the badge. The focus of the statutory language is the "essential assets of the business," which for Presidio

---

225   *Key Post-Trial Br.*, docket no. 624, ¶ 21 (citing Tex. Bus. & Com. Code § 24.003(b)); *Key Pre-Trial Br.*, docket no. 584, ¶ 19; *Key Resp. Br.*, docket no. 593, ¶ 10.

226   *See* Joint Exhibit 56 ¶¶ 4 (releasing guarantors of the Junior Loan); 7.7 (indicating transfer subject to Senior Loan and agreeing for Debtor to defend against Dougherty's enforcement against the Property); Joint Exhibit 10 (Senior Loan Agreement and subsequent amendments).

227   *Supra* note 86.

228   *Key Pre-Trial Br.*, docket no. 584, ¶ 19.

---

was the Property. Key's argument focuses on the equity in the essential asset, rather than the essential asset itself. Moreover, Debtor did not transfer the Property to Presidio's insider, even under the broad definition of that term under the TUFTA.[229] But even if the transfer were to a Presidio insider Debtor's eventual transfer was subject to the scrutiny and approval of the court, thus dispelling any concerns of fraud. This badge weighs against a finding of actual fraud.

### *12. Taken Together, the Badges of Fraud Do Not Indicate an Actual Fraudulent Intent*

The court finds that the list of badges of fraud discussed above address the evidence of the Objection sufficiently, thus the court need not seek to identify other badges of fraud. Only three badges discussed above favor a finding of actual intent to hinder, delay, or defraud creditors: (4) Presidio had been sued or had been threatened with suit; (5) the Deed in Lieu Agreement transferred substantially all of Presidio's assets; and (9) the Deed in Lieu Agreement rendered Presidio insolvent. The other badges discussed above—particularly those related to the exchange of reasonably equivalent value in an arm's-length transaction—outweigh any indicia of fraud. Accordingly, assuming the Deed in Lieu Agreement involved the transfer of an "asset," the court concludes that Presidio did not transfer the Property to Debtor with an actual intent to hinder, delay, or defraud creditors.

### *13. Alternatively, a Legitimate Purpose Precipitated the DILA*

Even assuming that Presidio had equity in the Property and that the badges of fraud indicated fraudulent intent, the court finds that Presidio had a legitimate purpose to execute the Deed in Lieu Agreement. The presumption of fraud raised by the presence of multiple badges may be rebutted if a legitimate purpose exists for the transfer.[230] Courts have accepted a number

---

229    *See* TEX. BUS. & COM. CODE § 24.002(7)(C)–(E).

230    *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994); *ASARCO LLC*, 396 B.R. at 391–92.

of purposes as legitimate, including raising capital, restructuring financial obligations, releasing guaranties, seizing upon good investment opportunities, and encouraging management's financial commitment to an enterprise.[231] In comparison, other courts have rejected purported purposes as illegitimate when the transfers deviated from standard business practices, were poorly documented, were intended to convert non-exempt assets into exempt property, or were supported only by the testimony of a witness found not to be credible.[232] Four factors identified by the Fifth Circuit to gauge whether a transfer's alleged purpose was legitimate include whether the transfer was: (1) pursuant to a standard business practice; (2) an arm's-length transaction; (3) voluntary or effectively forced upon the debtor; and (4) for proper consideration.[233]

All four of these factors are present here. The analysis hinges on value. Viewed from the lens for which Key advocates—that of a $65 million Property value—the Deed in Lieu Agreement smacks of suspicion. But, when viewed from the realistic vantage point of a Property value coinciding with the outstanding secured debt, a legitimate purpose is apparent. Presidio had already stretched its credit to default under the Junior and Senior Loans after a series of advances and missed payments.[234] Negotiations had broken down between the secured lenders

---

231    *E.g.*, *Kelly v. Armstrong*, 206 F.3d 794, 799 (8th Cir. 2000) (holding that four prepetition transfers by the debtors had legitimate purposes, including selling and leasing back a house to raise investment capital and pledging assets as collateral for a business loan and as an incentive for a business borrower to produce income and repay the loan); *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 420–21 (5th Cir. 1990) (holding that a debtor's sale of his equity interest in a closely held private company within three months of filing for bankruptcy was not fraudulent because the purpose for the arm's-length sale was to raise cash and obtain releases from guarantees of the company's debt); *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009) (concluding that certain post-default transfers of cash and equipment had legitimate purposes as part "of the Debtor's effort to operate in a tough economic climate for as long as possible and then to orderly shut down"); *ASARCO LLC*, 396 B.R. at 392 (noting that the debtor's sale of stock was a legitimate means to restructure debt).

232    *E.g.*, *Faulkner*, 413 B.R. at 485; *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 855 (Bankr. N.D. Tex. 2003), *aff'd*, 108 F. App'x 993 (5th Cir. 2004).

233    *In re Womble*, 289 B.R. at 855 (citing *In re Moreno*, 892 F.2d at 420–21).

234    *Feb. 11 Tr.*, docket no. 607, at 68:8–25, 75:18–25, 80:13–81:25, 164:1–15; *Mar. 19 Tr.*, docket no. 620, at 13:21–14:16.

as foreclosure loomed.[235]   Considering the dire situation surrounding a property valued at no more than the outstanding secured loans, the Deed in Lieu Agreement appears to be the natural result of a secured junior lender exercising its limited rights to recoup as much of its principal as possible and a broken debtor attempting to avoid foreclosure and bankruptcy.   Agreements to convey an encumbered property back to a secured lender in consideration for a release of the guarantors are a standard business practice.   The court has already concluded the Deed in Lieu Agreement was a voluntary arm's-length transaction for reasonably equivalent value. Accordingly, the court finds Presidio had a legitimate purpose for the Deed in Lieu Agreement sufficient to rebut any indicia of fraud.

---

235      *Supra* note 28.

### III. CONCLUSION

For the foregoing reasons, the court holds that the total encumbrances on the Property equaled or exceeded the Property's value on February 7, 2012, thus the Deed in Lieu Agreement did not involve a transfer of an "asset" within the meaning of Texas law.  Alternatively, the court concludes that the consideration received for the Deed in Lieu Agreement constituted reasonably equivalent value, thus negating a constructive fraudulent transfer.  The court further concludes that the analysis of the badges of fraud, with particular emphasis on reasonably equivalent value, as well as the legitimate purpose of the Deed in Lieu Agreement, support a finding that Presidio did not intend to hinder, delay, or defraud creditors by the Deed in Lieu Agreement.  Finally, the court declines to award costs and attorney's fees pursuant to this memorandum opinion and order.  *See* TEX. BUS. & COM. CODE § 25.013.  Accordingly, it is therefore

**ORDERED** that the Objection is **SUSTAINED**; and it is further

**ORDERED** that the Claim will be **DISALLOWED**.

**IT IS SO ORDERED**.

### ### END OF MEMORANDUM OPINION AND ORDER ###