

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 17, 2014**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| 1701 COMMERCE, LLC, F/K/A | § | |
| PRESIDIO FT. WORTH HOTEL, LLC, | § | CASE NO. 12-41748-DML-11 |
| | § | |
| DEBTOR. | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the court is *Richfield Hospitality, Inc.'s Second Request for Allowance of Administrative Claim* (docket no.[1] 536, the "Second Request"), filed by Richfield Hospitality, Inc. ("Richfield") in the chapter 11 bankruptcy case of 1701 Commerce, LLC ("Debtor"). Debtor objected to the Second Request. *Debtor's Objection to [the Second Request]*, docket no.

---

[1] "Docket no." will hereinafter refer to the corresponding docket entry in the above-captioned bankruptcy case (the "Case").

550. On July 15, 2014, the court held a hearing on the Second Request (the "Hearing") at which the court heard argument from counsel, received testimony from several witnesses,[2] and admitted into evidence exhibits identified as necessary.[3] Following the Hearing, the court took the Second Request and the Objection under advisement. At the court's request, both parties filed proposed findings of fact and conclusions of law after the Hearing.[4]

This contested matter is subject to the court's core subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(1), (2)(A)–(B), and (O). The court has constitutional authority to enter findings of fact and conclusions of law because determining the Second Request involves both estate administration and the claims allowance process. *See Stern v. Marshall*, 546 U.S. ___, 131 S. Ct. 2594, 2617–18 (2011) ("[T]he question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."). The court now issues these findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure[5] 7052 and 9014.

---

2    The testifying witnesses included: Ken Redlinger, Richfield's Group Comptroller ("Redlinger"); John P. Lewis, Jr., Debtor's former bankruptcy counsel; and Craig Burr, Senior Vice President of Debtor ("Burr").

3    The exhibits will be identified as "___-Ex. *n*," where "___" indicates the introducing party (*i.e.*, Richfield ["R."], Debtor ["D."], or Joint ["J."]) and "*n*" indicates the number of the exhibit. For a complete list of exhibits admitted into evidence, see docket nos. 667 and 669. Additionally, it is also appropriate in contested matters for the court to look to the entire record of the bankruptcy case. *In re Mirant*, 354 B.R. 113, 120 n.4 (Bankr. N.D. Tex. 2006) (citing *Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 203 (3d Cir. 1995)).

4    *[Debtor's] Proposed Findings of Fact and Conclusions of Law with Respect to [the Second Request]*, docket no. 673 ("Debtor's Proposed Findings and Conclusions"); *[Richfield's] Proposed Findings of Fact and Conclusions of Law Regarding [the Second Request]*, docket no. 672 ("Richfield's Proposed Findings and Conclusions"). Richfield also filed a brief in support. *[Richfield's] Post-Trial Br. in Supp. of [the Second Request]*, docket no. 671 ("Richfield's Post-Hr'g Brief").

Additionally, before the Hearing, Richfield filed *[Richfield's] Reply to [the Objection]* (docket no. 560, the "Reply"), and Debtor filed *Debtor's Pre-Hr'g Br. with Respect to [the Second Request]* (docket no. 662, "Debtor's Pre-Hearing Brief").

5    Hereinafter, "Rule" or "Rules," as appropriate.

# I. FINDINGS OF FACT

The court, having reviewed the evidence admitted at the Hearing, as well as Debtor's and Richfield's respective Proposed Findings and Conclusions, now makes the following findings of fact by a preponderance of the evidence.[6] All findings of fact, where appropriate, may be also construed as conclusions of law, and vice versa.

## A. The Parties

1.      Debtor filed the Case on March 26, 2012 (the "Petition Date"). During the Case, Debtor has managed its estate as a debtor-in-possession. No committee, trustee, or examiner has been appointed.

2.      On the Petition Date, Debtor's primary asset was the Sheraton Fort Worth Hotel and Spa, located at 1701 Commerce Street, Fort Worth, Texas, 76102 (the "Property"). Debtor acquired the Property on February 7, 2012, as a secured lender from its borrower, Presidio Hotel Fort Worth, L.P. ("Presidio"), under a deed in lieu of foreclosure agreement.

3.      Richfield managed the Property for Presidio pursuant to that certain *Operating Agreement for Sheraton-Fort Worth* (the "Operating Agreement") dated July 29, 2011, by and between Richfield and Presidio. Tr. 7/15 Hr'g at 9:22–10:5; J.-Ex. 49. The Operating Agreement is governed by, and to be construed in accordance with, Texas law. J.-Ex. 49 § 46.

4.      Pursuant to the Operating Agreement, Richfield was appointed as the manager of the Property for a five-year period, which began on August 1, 2011, the date that Richfield initially took over the management of the Property. *Id.* § 4.2. In addition to the Operating

---

6      Unless noted otherwise, factual references are based on evidence presented at the Hearing. The court's two earlier opinions in the Case (the "Prior Opinions") contain detailed factual recitations of the events surrounding Debtor's ownership of the Property and the Case. *In re 1701 Commerce, LLC (1701 Commerce II)*, 511 B.R. 812 (Bankr. N.D. Tex. 2014); *In re 1701 Commerce, LLC (1701 Commerce I)*, 477 B.R. 652 (Bankr. N.D. Tex. 2012). To the extent the Prior Opinions include factual findings relevant to the Second Request, the court incorporates those findings into these findings of fact. Moreover, capitalized terms not otherwise defined in these findings of fact and conclusions of law will have the same meaning ascribed in the Prior Opinions.

Agreement, Richfield was also a party to an *Assignment and Subordination of Operating Agreement and Consent* by and between Richfield, Presidio, and Dougherty Funding, LLC ("Dougherty"), Debtor's senior lender at the time. D.-Ex. 10 ¶ 6.

5.      Richfield is an independent property and resort management company with over forty years of experience and an approved operator for franchisors such as Starwood (*i.e.*, Sheraton), Hyatt, Hilton, Marriott, and similar national brands. Richfield employed over 160 employees who were directly involved in managing and operating the Property, as well as managed independent contractor-licensees who operated the spa, the gift shop, and the valet parking operations at the Property.

### B. The Terms of the Operating Agreement

6.      After Debtor acquired the Property, Richfield continued to manage the Property without a contract in place with Debtor, and Debtor paid Richfield's management fees in accordance with the rate set forth in the Operating Agreement. Tr. 7/15 Hr'g at 10:13–22. Under the Operating Agreement, Richfield accrued a base management fee of 2.5% of gross revenue (the "Base Management Fee"). The Base Management Fee was offset by a potential refund owed by Richfield to Presidio if Richfield missed certain target revenues (the "Rebate" or "Rebate Clause"). Specifically, section 20.1.1 of the Operating Agreement provided:

> 20.1.1. The Base Management Fee shall be calculated as equal to two and one half percent (2.5%) of Gross Revenue for each Operating Year or part thereof of the Operating Term; provided that, in the event the [Property] does not meet or exceed the budgeted Gross Operating Profit reflected on the Annual Budget for the Operating Year ending 2012 and each Operating Year thereafter, the Base Management Fee shall be reduced by the amount of the Gross Operating Profit shortfall, not to exceed 20% of the Base Management Fees otherwise due and payable. The Base Management Fee must be paid to (and may be withdrawn by) Operator from the Operating Accounts upon receipt of the monthly invoice for Management Fees from Operator.

J.-Ex. 49 § 20.1.1.

7.     Accordingly, if actual performance, as measured by Gross Operating Profit,[7] fell below budgeted performance, Richfield's total management fees would be reduced under the Rebate Clause by the lesser of the shortfall or twenty percent of the Base Management Fee. *Id.*

8.     During its ownership of the Property, Debtor paid Richfield approximately $557,000, representing Richfield's full management fees. Tr. 7/15 Hr'g at 13:16–23; 64:23–65:4; D.-Ex. 26 at 3182 (2012 Financial Package); D.-Ex. 27 at 5592 (2013 Financial Package). But the Property had a $1,102,268 shortfall from the budgeted Gross Operating Profit in 2012, and a $288,823 shortfall during the time Richfield managed the Property in 2013. Tr. 7/15 Hr'g at 26:13–19; 33:17–34:6; D.-Ex. 26 at 3183; D.-Ex. 27 at 5593. Under the Operating Agreement, these shortfalls resulted in Debtor overpaying Richfield $75,716.80 for 2012 and $41,274.40 for 2013, totaling $116,991.20.[8] Tr. 7/15 Hr'g at 30:6–12; 32:21–33:1; 33:17–34:6; D.-Ex. 26 at 3182–83; D.-Ex. 27 at 5592–93.

9.     Section 20.2 of the Operating Agreement required Richfield to refund any Rebate within ninety days after the end of the Operating Year. J.-Ex. 49 §§ 19.3, 20.2. Consequentially, the refund for 2012 was due by March 31, 2013, and the refund for 2013 was due by March 31, 2014. Richfield did not pay Debtor the refunds for 2012 or 2013 as required by section 20.2 of the Operating Agreement. Tr. 7/15 Hr'g at 27:20–28:13; 30:6–21; 32:7–20; 68:19–23.

---

7     "'Gross Operating Profit' means with respect to any period of time, the amount by which Gross Revenue for such period exceeds Operating Expenses for the same period." J-Ex. 49 at 3.

8     Richfield's Base Management Fee for 2012 was $378,584. D.-Ex. 26 at 3182. Accordingly, because of the shortfall between actual and budgeted Gross Operating Profit for 2012, Richfield owed Debtor a rebate of a maximum of twenty percent of its Base Management Fee—$75,716.80. J.-Ex. 49 § 20.1.1. Likewise, the 2013 Base Management Fee was $206,372. D.-Ex. 27 at 5592. The 2013 Rebate was capped at twenty percent of this Base Management Fee–$41,274.40. J.-Ex. 49 § 20.1.1. Because these amounts were to have been refunded under the Rebate Clause, Richfield received an overpayment for its management fees in 2012 and 2013.

10. The Operating Agreement also included two provisions related to fees potentially accrued upon Richfield's termination as manager of the Property. First, section 28.3 included a liquidated damages clause if Presidio wrongfully terminated Richfield that stated:

28.3. Owner and [Richfield] further acknowledge and agree that [Richfield's] damages in the event of Owner's wrongful termination of this Agreement or [Richfield's] termination of this agreement due to Owner's breach (a "**Breach Termination**") it would be difficult or impossible to determine, including, without limitation, loss of the Management Fee and other revenue under this Agreement, harm to [Richfield's] reputation, loss of goodwill, disruption of operations, loss of contributions to budgeted system expenses and loss of a hotel with strategic significance to [Richfield's] system. Given the inherent uncertainty as the measure of damages and the Parties desire to establish a methodology for the calculation of damages, Owner and [Richfield] agree that [Richfield] shall be entitled to receive as liquidated damages in the event of a Breach Termination an amount (the "**Liquidated Damage Amount**") equal in aggregate to (i) the Imputed Management Fees times (ii) the Multiplier. For such purposes:

28.3.1. "**Imputed Management Fees**" shall be the monthly average of the aggregate Management Fees paid or payable to [Richfield] under this Agreement based on the 12-month period for which monthly operating reports have been delivered to the Owner immediately preceding the date of the written notice or other action of Owner which effects a Breach Termination . . . ; and

28.3.2. the applicable "**Multiplier**" shall be the greater of (i) number of months or partial calendar month from the effective date of termination through to the end of the eighteenth (18th) month of the Operating Term or (ii) six (6).

J.-Ex. 49 §§ 28.3, 28.3.1, 28.3.2 (emphasis in original).

11. In addition to providing liquidated damages based upon a Breach Termination, the Operating Agreement also provided that a termination fee accrued to Richfield if the Property was sold during the operating term (the "Termination Fee"). The Operating Agreement defines the Termination Fee as

[T]he sum of (i) Imputed Management Fees multiplied by three (3), plus (ii) repayment of all funds advanced by Operator for the Operation of the Hotel in accordance with this Agreement, including an amount equal to the Initial Working Capital Payment (to the extent actually contributed by Operator in accordance with this Agreement) together with accrued interest thereon from the date of initial payment of the Initial Working Capital Payment at the rate of five percent (5%) per annum.

J.-Ex. 49 at 9. Moreover, section 28.3.3 of the Operating Agreement provides:

> 28.3.3. <u>Termination Upon Sale.</u> In addition to the foregoing, Owner shall have the right to terminate this agreement upon a sale of the [Property] to any bona fide third-party purchaser at any time after the date which is twelve (12) months after the Takeover Date by providing Manager thirty (30) days prior written notice; provided that in such event, Owner shall pay [Richfield] the Termination Fee.

*Id.* § 28.3.3.

12.     The Termination Fee accrued if the Property sold regardless of whether the buyer qualified as a bona fide third-party purchaser. *Id.* But, because section 28.3.3 allowed the Owner to sell the Property to a bona fide third-party purchaser, such a sale and subsequent termination of Richfield's management services would not constitute Breach Termination. *Compare id.*, *with id.* § 28.3.

13.     The Operating Agreement also included an indemnity provision and related provision for the payment of attorneys' fees. Section 25.10 states:

> 25.10. Owner shall indemnify, defend, and hold harmless Operator and its officers, directors, agents, and employees, from and against any and all claims, liabilities, losses, damages, costs, and expenses of any kind or character, including without limitation court costs, reasonable attorneys' fees, expert witness fees, interest, fees, and penalties, arising from or related to the management, operation, or maintenance of the Property, including without limitation those arising from or related to: (a) any licenses required for operation of the Property; (b) the Employment Laws; (c) the Americans with Disabilities Act; (d) any Prior Claims, and (e) the presence of asbestos, asbestos containing materials, mold, petroleum products, regulated chemicals and substances, and any other materials that are classified as hazardous or dangerous under any federal, state, or local statute, law, ordinance, rule, or regulation before, during, or after the Term ("Hazardous Materials"), in all cases to the fullest extent permitted by law, except to the extent such liabilities result from the fraud or gross negligence of any of Operator's corporate-office personnel in the management, operation, or maintenance of the Property.

J.-Ex. 49 § 25.10.

14.     The payment mechanism for the indemnity provision in section 25.10 is in section 25.12 and provided as follows:

25.12. All costs and expenses, including without limitation reasonable attorneys' fees, of any legal proceedings that are instituted against the Property, Operator, or both related to the operation, management, or maintenance of the Property, including without limitation any employment-related claims of any nature, shall be charged as Operating Expenses or paid directly by Owner; provided, however, that Operator shall reimburse Owner on demand to the extent the fraud or gross negligence of any of Operator's corporate-office personnel in the management, operation, or maintenance of the Property is established in such proceedings. Owner specifically acknowledges and agrees that any party's mere allegation or claim of a negligent or intentional act by Operator or any officer, director, agent, or employee thereof does not trigger any obligation of Operator under Section 25.11 and that, pending the determination of any question as to whether Operator or any of its officers, directors, agents, or employees are entitled to indemnification under Section 25.10, Operator shall be entitled to charge as Operating Expenses and pay from Operating Accounts all expenses of defending or otherwise handling any claim or litigation under this Agreement.

*Id.* § 25.12.

### C. Richfield's Employment as an Estate Professional

15.     On April 27, 2012, Debtor filed *Debtor's Motion and Application for Authority to Employ [Richfield] as Property Manager and to Enter into Operating Agreement for Management and Operation of [the Property]* (docket no. 60, the "Motion to Employ Richfield"). J.-Ex. 9. Attached to the Motion to Employ Richfield was a new operating agreement Debtor and Richfield had negotiated and signed post-petition (the "Debtor Proposed Agreement").

16.     The Debtor Proposed Agreement differed from the existing Operating Agreement in several ways.[9] First, the Debtor Proposed Agreement removed sections 28.2, 28.3, 28.3.1, and 23.3.2 in the Operating Agreement, thereby eliminating any potential damages related to Richfield's termination. Tr. 7/15 Hr'g at 91:18–92:13; 158:15–159:4; J.-Ex. 9 at 4745–46. Second, the Debtor Proposed Agreement allowed Debtor to terminate Richfield for any reason,

---

[9]     *See infra* Conclusions of Law ¶ 11 for the court's ruling on Richfield's objection to the admission of the Debtor Proposed Agreement and other parol evidence.

including sale of the Property, on thirty days' notice. Tr. 7/15 Hr'g at 89:18–90:24; 152:10–22; 158:8–19; J.-Ex. 9 at 4722 ("Termination Fee" definition removed); D.-Ex. 55 at 3792 (same). The Debtor Proposed Agreement changed section 28.3.3 of the Operating Agreement to permit Debtor to terminate the Debtor Operating Agreement upon the Property's sale to a bona fide third-party purchaser on thirty days' notice, without a termination penalty. J.-Ex. 9 at 4745–46. In exchange for these changes, Debtor agreed to eliminate the Rebate Clause of section 20.1.1 in the Operating Agreement. Tr. 7/15 Hr'g at 25:1–26:6; 97:3–11; 153:24–154:8, 155:9–22. The Debtor Proposed Agreement did not alter any of the indemnification provisions in section 25 of the Operating Agreement. *Id.* at 159:5–10; J.-Ex. 9 at 4742–43.

17.     On May 12, 2012, Dougherty filed an objection to the Motion to Employ Richfield (the "Dougherty Objection"). *[Dougherty's] Objection to [the Motion to Employ Richfield]*, docket no. 95 (D.-Ex. 10). In the Dougherty Objection, Dougherty objected to any attempt by Debtor and Richfield to enter into a new management agreement and argued that "there is already an operating agreement for the Property in place with Richfield for [Dougherty's] benefit. If Richfield enters into the new operating agreement with the Debtor, Richfield will be breaching the current operating agreement and depriving [Dougherty] of valuable protections under the agreement." *Id.* ¶ 3.

18.     The parties agreed to continue the hearing on the Motion to Employ Richfield for several months pending the court's decision on Dougherty's motions to lift the stay or to dismiss the case. Burr testified that Debtor operated as if the Debtor Proposed Agreement was effective. Tr. 7/15 Hr'g at 157:9–19; 185:3–6. However, the Debtor Proposed Agreement never became effective, per its terms, and thus Debtor's payments to Richfield during the pendency of the Motion to Employ Richfield were in accord with section 20.1.1 of the Operating Agreement.

19.    Also during this time Dougherty and Richfield negotiated another version of an operating agreement between Debtor and Richfield (the "Dougherty Proposed Agreement"), a draft of which was submitted to the Court.  J.-Ex. 17 at 75–124; D.-Ex. 16.

20.    Like the Debtor Proposed Agreement, the Dougherty Proposed Agreement eliminated provisions related to termination fees and penalties and included provisions allowing Richfield to be terminated, without penalty, upon short notice or upon the sale or foreclosure of the Property.  Tr. 7/15 Hr'g at 102:13–103:25; 159:16–23; J.-Ex. 17 at 110–11.

21.    On August 23, 2012, the court entered its *Memorandum Opinion and Order* (docket no. 155) in which the court determined that Debtor had filed the Case in bad faith.  *1701 Commerce I*, 477 B.R. at 659.  The court further noted "Debtor was not a party to the agreements between [Presidio] and, *inter alia*, the City, [Presidio's] franchisor (Sheraton), and Richfield, but Debtor has taken steps to assume [Presidio's] position vis-à-vis those entities."  *Id.* at 656.

22.    On September 25, 2012, the court resumed the hearing on the Motion to Employ Richfield.  Debtor's former counsel stated that Debtor Proposed Agreement was "very similar to the [Operating Agreement] . . . , with some changes, the most important of which to the Debtor is that it's terminable upon 30 days' notice or certain other conditions, which I think includes the sale of the [Property]."  J.-Ex. 45 at 3:19-24 (Tr. 9/25/12 Hr'g). Debtor's former counsel later stated that the Debtor Proposed Agreement was "essentially the [Operating Agreement] with a few deletions to make it essentially a 30-day interim—an interim agreement subject to a 30-day cancellation notice by either side."  *Id.* at 5:8–11.

23.    The court neither granted the Motion to Employ Richfield nor adopted the Dougherty Proposed Agreement.  Instead, the court directed the parties to prepare an order employing Richfield as an estate professional.  After the hearing on the Motion to Employ

Richfield, Debtor, Dougherty, and Richfield circulated a draft order and exchanged comments and revisions. On October 9, 2012, the court entered its *Order Approving [Richfield] as Property Manager* (docket no. 200, the "Employment Order"), which stated:

> **IT IS THEREFORE ORDERED** that Richfield is hereby appointed by the Court to be the property manager of the Sheraton Fort Worth Hotel and Spa on the same terms as those contained within that certain Operating Agreement for Sheraton-Fort Worth (the "Agreement") dated July 29, 2011 by and between Richfield and Presidio Property Fort Worth, LP. It is further
>
> **ORDERED** that the Court's appointment and the employment of Richfield shall be retroactive *nunc pro tunc* to March 26, 2012 (the "Petition Date") and shall terminate at such time as the Sheraton Fort Worth Hotel and Spa is no longer property of the Debtor's bankruptcy estate or upon further order of the Court. It is further
>
> **ORDERED** that the obligations owed to Richfield as property manager under the Agreement from and after the Petition Date are hereby deemed to be obligations *of the estate* effective as of the Petition Date, to the extent that such terms and obligations are applicable to the Debtor's operation of the Sheraton Fort Worth Hotel and Spa during the pendency of this Bankruptcy Case.
>
> **ORDERED** that any compensation paid and/or payable to Richfield as the property manager of the Sheraton Fort Worth Hotel and Spa under the Agreement will be paid as provided under the orders of this Court pursuant to section 363 of the United States Bankruptcy Code authorizing use of cash collateral and in accordance with and pursuant to the Agreement, and the Court hereby approves any such compensation without the need for Richfield to submit interim and final fee applications.

J.-Ex. 25 at 2.

### *D. Richfield's First and Second Requests for Administrative Expenses*

24. On July 17, 2013, Debtor sold the Property to 1701 Commerce Acquisitions, LLC, and Richfield was terminated as Property manager. Assuming the Operating Agreement bound Debtor and Richfield, upon termination Richfield accrued a Termination Fee of

$92,280.75.[10] Likewise, if Debtor's termination of Richfield's services constituted Breach Termination under the Operating Agreement, Richfield accrued Liquidated Damages totaling $184,561.50 in addition to the Termination Fee.[11]

25. Richfield did not request the Liquidated Damage Amount or a Termination Fee. On April 30, 2013, Richfield filed *[Richfield's] Request for Allowance of Administrative Claim* (docket no. 467, the "First Request"), which requested certain payments Richfield incurred defending lawsuits related to the Property be paid as administrative expenses of Debtor's estate. J.-Ex. 53. Debtor agreed to the First Request, and the court entered a *Stipulation and Agreed Order Regarding [the First Request]* (docket no. 478). J.-Ex. 54.

26. On August 8, 2013, approximately one month after Debtor sold the Property to 1701 Commerce Acquisitions, Richfield provided Debtor with a list of expenses owed to Richfield on account of the termination that did not include penalties or fees. D.-Ex. 28 at 3718; Tr. 7/15 Hr'g at 38:2–39:24. Redlinger testified that all of these requested amounts were unreimbursed costs related to Richfield's operation of the Property and that Vestin paid each of the requested expenses. Tr. 7/15 Hr'g at 44:25–45:2. Likewise, all of Richfield's management fees during the Case were paid in the ordinary course of business as administrative expenses pursuant to the Employment Order. *Id.* at 64:23–65:4.

27. Three months later, Richfield filed *[Richfield's] Second Request for Allowance of Administrative Claim* (docket no. 536, the "Second Request") seeking payment as administrative

---

10     J.-Ex. 50. The Imputed Management Fee for the twelve months immediately preceding Richfield's termination was $30,760.25. *Id.* Accordingly, the Termination Fee was calculated as the Imputed Management Fee times three: $92,280.75. Exhibit 50, which was admitted jointly, provides the calculation for the Termination Fee but does not request any accrued interest.

11     J.-Ex. 51. Termination occurred more than eighteen months into the Operating Term, so the Multiplier of the Imputed Management Fee was six months. *See* J.-Ex. 49 § 28.3.2. Accordingly, the Imputed Management Fee ($30,760.25) multiplied by the Multiplier (6 months) produces the Liquidated Damages Amount of $184,561.50.

expenses a Termination Fee and Liquidated Damage Amount on account of its termination as Property manager. *Second Request*, docket no. 536, ¶¶ 14–15, 22–23.

28. Richfield also requested characterization as administrative expenses its attorneys' fees related to (1) the Case generally, (2) specific contested matters within the Case, (3) the First and Second Requests, and (4) adversary and state-court proceedings related to the Case. *Id.* ¶¶ 16, 24. The exhibits admitted at the Hearing include unredacted copies of Richfield's bills, R.-Ex. 40, as well as a color-coded copy of those same bills Debtor prepared to categorize those line-items it deems compensable, D.-Ex. 41. Additionally, the parties have submitted a number of email exchanges as to the character of Richfield's requested expenses, as well as a different set of bills for attorneys' fees connected to the First Request. *See* D.-Exs. 35–38, 57–58.

29. Both Debtor and Richfield have categorized Richfield's attorneys' fees and provided total amounts for each respective category that each side deems compensable.[12] The unredacted bills themselves are listed chronologically and thus do not provide an itemized summary of the expenses grouped by category. *See* R.-Ex. 40; D.-Ex. 41.

30. Richfield asserts its attorneys' fees must be paid pursuant to the indemnity provisions in section 25.12 of the Operating Agreement. However, Redlinger admitted that Richfield is not entitled to many of the fees it is seeking in the Second Request. Specifically,

---

12 Richfield's categories and respective amounts are: (1) First Request: $5,449; (2) Second Request: $28,310.33; (3) Bankruptcy Review and Case Administration: $10,183.50; (4) Matters Related to Dougherty Litigation and Cash Collateral: $16,501.50; (5) Matters Related to the Employment of Richfield: $20,560.50; and (6) Matters Related to the Sale of the Hotel: $4,648. *Richfield's Post-Hr'g Br.*, docket no. 671, ¶¶ 42–46. Richfield did not provide a summary of the expenses included within each category.

In comparison, Debtor's categories are: "(1) fees incurred by Richfield making [the First and Second Requests] and in defending Debtor's claim against Richfield for theft; (2) fees incurred in the negotiation, preparation and carrying into effect of the management agreements; (3) fees to monitor the bankruptcy, largely with the purpose of becoming formally employed and getting paid; [and] (4) fees incurred as a result of legal actions against Debtor in which Richfield was embroiled as a witness." *Debtor's Pre-Hr'g Br.*, docket no. 662, at 20–21. Debtor contends that only the fees in the fourth category, totaling $9,347, are "arguably recoverable under Section 25 [of the Operating Agreement." *Id.* at 25–26. Debtor provides a detailed summary of only those expenses falling under its fourth category. D.-Ex. 43.

Redlinger admitted that (1) Debtor should not pay for fees incurred attempting to enter into an operating agreement with, or obtain a liquor license for, 1701 Commerce Acquisitions, Tr. 7/15 Hr'g at 45:14–22; 50:13–18; 52:6–19;[13] (2) fees incurred for negotiating operating agreements with Debtor, Dougherty, and 1701 Commerce Acquisition, should not be charged to Debtor, *id.* at 57:25–59:6; and (3) Richfield retained counsel to protect its own interests in the Case, *id.* at 72:19–23.

31.     During the Hearing, Redlinger also suggested that Richfield might also be seeking attorneys' fees under section 40 of the Operating Agreement, which states:

> 40.1.  In any arbitration or litigation the prevailing party shall be awarded its attorneys' fees, expert witness fees, and such related expenses.

> 40.2 Save as otherwise stated in this [Operating Agreement], each Party shall pay its own costs and expenses in relation to the negotiation, preparation, execution, and carrying into effect of this [Operating Agreement].

J.-Ex. 49 § 40.1–.2; Tr. 7/15 Hr'g at 54:11–18.

## II. CONCLUSIONS OF LAW

1.      Section 503 of the Bankruptcy Code[14] provides in pertinent part that—

> (b) [a]fter notice and hearing, there shall be allowed administrative expenses . . . including—

> (1)(A) the actual, necessary expenses of preserving the estate…

11 U.S.C. § 503(b)(1)(A).  In addition, section 364(a) grants an automatic administrative priority to claims for post-petition debts incurred in the ordinary course of a debtor's business.  *Id.* § 364(a).

---

13      *See also* Tr. 7/15 Hr'g at 83:13–25 (Richfield's counsel acknowledging that Richfield was not seeking its fees for trying to be hired by the Purchaser or for the fees expended in defense of Debtor's adversary proceeding against Richfield).

14      11 U.S.C. §§ 101 *et seq.* (2006) (the "Code").

2.      As the Property's manager, Richfield's operation and management of Debtor's largest asset were, at least in part, actual and necessary expenses of preserving Debtor's bankruptcy estate under section 503(b)(1).   Debtor does not challenge that Richfield's management fees accrued during the Case were administrative expenses; indeed, Debtor has already paid these fees as administrative expenses.  *See* Tr. 7/15 Hr'g at 64:23–65:4.

3.      Although the Employment Order appointed Richfield as Property manager on the "same terms as those contained within" the Operating Agreement, the parties dispute what terms governed Richfield's employment.   Specifically, Debtor and Richfield dispute whether the Liquidated Damage Amount and the Termination Fee accrued upon Richfield's termination as the Property's manager as well as whether such costs should be considered administrative expenses.   The former turns on whether the Operating Agreement between Presidio and Richfield later bound Debtor or Debtor's estate upon Richfield's employment as an estate professional.  The latter depends on the interpretation of whatever, if any, terms of the Operating Agreement the Employment Order incorporated.

4.      Debtor and Richfield also dispute whether either side may recover attorneys' fees in connection with the Second Request.  Richfield requested $58,773.14 in attorneys' fees in the Second Request.[15]   Both Debtor and Richfield also seek to recover fees and costs in connection with litigating the Second Request pursuant to section 40.1 of the Operating Agreement (the "Prevailing Party Provision").  *See* Tr. 7/15 Hr'g at 172:5–18; D.-Ex. 44.  At the Hearing, the court deferred determination of attorneys' fees payable under the Prevailing Party Provision until after determining liability.  Tr. 7/15 Hr'g at 172:5–19.

---

15    This number grew in the Richfield's Post-Hearing Brief to either $85,134.84, based on the stated amount requested, or $85,652.83, based on the sum of the specific categories Richfield identifies.  *Compare Richfield's Post-Hr'g Br.*, docket no. 671, ¶ 32, *with id.* ¶¶ 42–46.  As will be discussed, the difference is immaterial.  *Infra* Section II.E.

### A. The Employment Order Incorporated the Operating Agreement
### to Govern the Relationship Between Richfield and the Estate

5.      When interpreting a court order, courts "apply traditional principles of contract law and look to the intent of the issuing court." *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 263 (2d Cir. 2011). That a court must interpret a contract as a whole so as to give reasonable meaning and effect to all its parts and provisions is well-established. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *see also Patsy's Italian Rest.*, 658 F.3d at 263 ("Under traditional principles of contract law, a contract should be construed so as to give full meaning and effect to all of its provisions.") (internal quotations and punctuation omitted). As a result, "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *J.M. Davidson*, 128 S.W.3d at 229 (citing *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962)).

6.      As traditional contract rules apply to interpreting court orders, the court must determine its ability to consider parol evidence related to the Employment Order. Richfield objected to Debtor introducing parol evidence, arguing that the Employment Order "was a fully-integrated [sic] document . . . not susceptible to interpretation, and, as such, none of the previous negotiations should be entered into evidence under the parol[] evidence rule." Tr. 7/15 Hr'g at 88:25–89:9.

7.      Whether an agreement is ambiguous determines the court's ability to consider parol evidence. An agreement is ambiguous if, when considered as a whole, the instrument "is subject to more than one reasonable interpretation in light of the circumstances present at the time of its formation." *Wallerstein v. Spirt*, 8 S.W.3d 774, 780 (Tex. App.—Austin 1999, no

pet.) (citing *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)). "An ambiguity does not arise simply because the parties advance different interpretations of the contract's language." *Id.* (citing *Grain Dealers*, 943 S.W.2d at 458). But where an agreement is subject to two or more reasonable interpretations, the contract is ambiguous, creating a fact issue as to the parties' intent. *J.M. Davidson*, 128 S.W.3d at 229.

8.     The parol evidence rule is not a rule of evidence but rather a rule of substantive contract law that bars evidence of prior or contemporaneous agreements or negotiations that contradict the terms of an integrated, complete writing. *Jack H. Brown & Co., Inc. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990) (quoting *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958)); RESTATEMENT (SECOND) OF CONTRACTS § 213 cmt. a (1981). Where an agreement's terms are ambiguous a court may consider extrinsic evidence to interpret an agreement to the extent that such extrinsic evidence does not contradict the final agreement. *See GSL of Ill, LLC v. McCaffety Elec. Co. (In re Demay Int'l LLC)*, 471 B.R. 510, 522 n.18 (Bankr. S.D. Tex. 2012).

9.     Construing the entirety of the Employment Agreement, the court concludes that the Employment Agreement is subject to at least two reasonable interpretations and is, therefore, ambiguous. Although the first decretal paragraph states that Richfield is appointed "on the same terms as those contained within" the Operating Agreement, the remaining decretal paragraphs modify terms within the Operating Agreement. For instance, the second decretal paragraph provides that Richfield's employment "shall terminate at such time as the [Property] is no longer property of the Debtor's bankruptcy estate," thus modifying the "Operating Term" under the Operating Agreement. *See* J.-Ex. 49 at 8. Likewise, the third decretal paragraph limits the obligations of the estate under the Operating Agreement "to the extent that such terms and

obligations are applicable to the Debtor's operation of the [Property] during the pendency of this Bankruptcy Case," thus modifying any obligations under the Operating Agreement between the Owner and Operator irrespective of the Case. These terms contained within the Employment Order raise an ambiguity because reasonable minds could disagree as to the terms of Richfield's employment as an estate professional.

10. Alternatively, evidence of prior and contemporaneous statements and negotiations concerning the Employment Order is relevant to Richfield's request for attorneys' fees. Specifically, Richfield seeks payment of attorneys' fees incurred during the bankruptcy case related to its employment as an estate professional. *Richfield's Post-Hr'g Br.*, docket no. 671, ¶ 45. Thus, even if the Employment Order and the Operating Agreement are not subject to interpretation using extrinsic evidence, the evidence is nonetheless admissible to determine whether Richfield's attorneys' fees were "actual, necessary costs . . . of preserving the estate . . . ." *See* 11 U.S.C. § 503(b)(1)(A).

11. Accordingly, the court overrules Richfield's objection to Debtor's introduction to parol evidence related to the Employment Order. *See* Tr. 7/15 Hr'g at 88:25–89:9.[16]

12. Considering all evidence presented, the court holds that the Employment Order incorporated all of the terms of the Operating Agreement as estate obligations owed to Richfield to the extent that such terms were not inconsistent with, or expressly modified within, the Employment Order. Neither party may parse the terms of the Operating Agreement to choose

---

16  The court, however, notes that the effect on Richfield's recovery is the same regardless of the admission of parol evidence. As will be discussed, the court determines under the Operating Agreement that the Debtor's ability to offset the unpaid Rebate overwhelms any allowable administrative expenses. The parol evidence suggests that negotiations over two new operating agreements struck the Termination Fee, Liquidated Damage Amount, and the Rebate Provision alike. As a result, either the Debtor Proposed Agreement governs, and Richfield is thus not entitled to any fees or, as the court holds, the net effect more than cancels any recovery for Richfield.

which obligations it will undertake.  Instead, both parties must live with the benefits and the burdens of the Operating Agreement that are not otherwise modified by the Employment Order.

### B. No Breach Termination Occurred

13.     Richfield argues that Debtor's termination of Richfield as the Property's manager constituted Breach Termination, thus Richfield is due $184,561.50 pursuant to the Liquidated Damage Amount provision of the Operating Agreement.  Tr. 7/15 Hr'g at 7:12-8:25; J.-Ex. 50. Richfield alleges Breach Termination occurred because Debtor sold the Property to 1701 Commerce Acquisitions, which Richfield argues was a Presidio affiliate.  Accordingly, Richfield argues 1701 Commerce Acquisitions did not constitute a "bona fide third-party purchaser" under section 28.3.3 of the Operating Agreement and, consequentially, Richfield's termination was wrongful under section 28.3.  J.-Ex. 48 ¶ 22.

14.     The court has already determined that 1701 Commerce Acquisitions was not an affiliate of Presidio.  *1701 Commerce II*, 511 B.R. at 837, 842.  There, the court stated "Debtor did not transfer the Property to Presidio's insider, even under the broad definition of that term under the TUFTA." *Id.* at 842 (citing TEX. BUS. & COM. CODE § 24.002(7)(C)–(E), which includes "affiliate, or an insider of an affiliate . . . " within the definition of "insider").

15.     However, the relationship between Presidio and 1701 Commerce Acquisitions is irrelevant for the purposes of Breach Termination.  Rather, the relationship between Debtor and 1701 Commerce Acquisitions determines whether the sale of the Property was an arms-length transaction to a bona-fide third-party purchaser.  Put another way, whether Debtor and 1701 Commerce Acquisitions are related entities determines whether 1701 Commerce Acquisitions was a "third party."  To that effect, the court's order approving the sale to 1701 Commerce Acquisitions stated:

> Debtor and the Purchaser have at all times acted in good faith and in accordance with applicable law. The Purchaser is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Sale of the Assets to the Purchaser pursuant to the APA is a sale in good faith within the meaning of section 363(m) of the Bankruptcy Code, and the Purchaser is entitled to the protections of section 363(m).

*Order (I) Granting Debtor's Motion for Entry of an Order Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) Approving the Limited Settlement with [Presidio] and (II) Approving Sale of Hotel*, docket no. 414, ¶ I.

16.     Accordingly, termination was proper pursuant to section 28.3.3 of the Operating Agreement, and no Breach Termination occurred.   As a result, Richfield did not accrue a Liquidated Damage Amount under section 28.3 of the Operating Agreement, and the request for the Liquidated Damage Amount of $184,561.50 to be paid as an administrative expense is DENIED.

### C. Richfield Accrued a Termination Fee upon Termination

17.     Alternatively, Richfield argues it accrued a Termination Fee of $92,280.75 upon termination, pursuant to section 28.3.3 of the Operating Agreement, even if the Property was sold to a bona fide third-party purchaser.

18.     For a claim to be allowed as an administrative expense under section 503(b)(1)(A) must demonstrate that "(1) the claim arises from a transaction with the debtor; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function." *TransAm. Natural Gas Corp. v. GHR Energy Corp. (In re TransAm. Natural Gas Corp.)*, 978 F.2d 1409, 1417 (5th Cir. 1992).  The Fifth Circuit has emphasized the importance of section 503 of the Code to ensure third-parties will do business with debtors post-petition.  *Id.* at 1415–16. This policy supports allowing third-parties to provide services and benefits to a debtor in exchange for priority payment.  *Id.* at 1417.

19. Debtor asserts that Richfield may not recover the Termination Fee as an administrative expense. According to Debtor, Richfield had agreed to compensation under the Debtor Proposed Agreement exclusive of termination fees, thus "Richfield has no argument that it required the termination payment in order to be willing to provide post-petition services[.]" *Debtor Pre-Hr'g Br.*, docket no. 662, at 18. Likewise, Debtor argues that "[w]here an administrative expense claimant has already been paid for its goods or services, no administrative expense is necessary to ensure that the claimant receives consideration, because the debtor has already performed." *Id.* (citing *In re Visi-Trak, Inc.*, 266 B.R. 372, 376 (Bankr. N.D. Ohio 2001) (denying administrative expense priority to legal fees in a patent infringement suit against the debtor because the claimant could not "demonstrate what fees [were] attributable to post-petition contracts" and could not "establish a clear benefit to the estate").[17] Finally, Debtor argues that "the expense must have been incurred 'in order to benefit the estate as a whole, not to further [the claimant's] own self-interest.'" *Id.* at 19 (quoting *In re Hayes*, 20 B.R. 469, 472 (Bankr. D. Wis. 1982)).

20. These arguments are unpersuasive. Based on the court's holding that the Operating Agreement governed the relationship between Richfield and the Estate, section 28.3.3 applies. That section allows the Owner to terminate the Operating Agreement upon a sale of the Property to bona-fide third-party purchaser upon three conditions: (1) termination must occur after August 2, 2012; (2) the Owner must provide at least thirty days' notice of termination; and (3) the Owner must pay the Termination Fee. J.-Ex. 49 § 28.3.3. None of these provisions run afoul with the Richfield Employment Order.

---

17 Debtor's reliance on *In re Visi-Track* is misplaced. Richfield has not been paid for its goods and services, at least not in full. *Cf. In re Visi-Trak, Inc.*, 266 B.R. at 376. The Termination Fee is part of the compensation owed under the Operating Agreement, thus Debtor has not fully performed. Accordingly, *In re Visi-Track* is distinguishable.

21.    The Termination Fee also satisfies the requirements of section 503(b)(1)(A).  The transaction in question, Richfield's management of the Property, involved both Debtor and Debtor's estate.  Likewise, the Termination Fee was part and parcel of Richfield's compensation under the Operating Agreement.  As already discussed, the Employment Order adopted the entirety of the Operating Agreement's terms not otherwise contradictory to the Employment Order.  Neither party may choose which terms apply based on peculiar convenience.

22.    Accordingly, the court holds that the request for the Termination Fee of $92,280.75 to be paid as an administrative expense is GRANTED.

*D. Richfield's Termination Fee Must Be Offset by the Amount of the Unpaid Rebates*

23.    Although the court concludes that Richfield accrued a Termination Fee, Debtor has the right to offset the unpaid Rebate of Richfield's 2012 and 2013 management fees pursuant to the Amended Plan and section 558 of the Code.

24.    Section 558 affords the estate those defensive protections available to the debtor, providing that:

> The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses.  A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.

11 U.S.C. § 558.

25.    Section 558 "provides the trustee with every defensive weapon available to the debtor," including both affirmative and negative defenses.  5 COLLIER ON BANKRUPTCY ¶ 558.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).  One such weapon is the ability to setoff against administrative expenses amounts owed to the debtor.  *E.g.*, *In re Circuit City Stores, Inc.*, No. 08-35653, 2009 WL 4755253, at *3 (Bankr. E.D. Va. Dec. 3, 2009); *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002) ("Courts have held that § 558 preserves any right of

setoff the debtors may have under state law, including the right to setoff debtor's prepetition claims against administrative claims.").[18] Several courts have held that the debtor's setoff rights are not bounded by the prepetition/post-petition distinction for mutuality of debts. *In re Women First Healthcare, Inc.*, 345 B.R. 131, 134–35 (Bankr. D. Del. 2006) (collecting cases).

26. Debtor has a claim for setoff against Richfield for its failure to refund the Rebate of 2012 and 2013 management fees as required by section 20.1.1 of the Operating Agreement.[19] Although potentially not required for setoff under section 558 of the Code, the court notes that the debts at issue (*i.e.*, the Termination Fee and the Rebate) arose post-petition between the same parties, thus mutuality exists.

27. Based on the foregoing analysis, the court holds that the $116,991.20 Rebate owed by Richfield to Debtor must offset the Termination Fee accrued owed by Debtor to Richfield.

---

18 The Amended Plan reserves Debtor's rights of setoff and recoupment in section VI.F, providing: "Debtor and the Post-Confirmation Debtor, as applicable, may, *pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law*, exercise its right of setoff or recoupment against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim . . . ." *Am. Plan*, docket no. 544, at 13–14 (emphasis added). Section 553 provides a remedy for creditors, not debtors. *In re M.W. Ettinger Transfer Co.*, No. 4-88-3020, 1988 WL 129334, at *3 (Bankr. D. Minn. Nov. 29, 1988) ("Section 553 deals only with setoffs by a creditor; by its terms it has no application to a *debtor's* attempt to setoff.") (emphasis in original); *In re Braniff Airways, Inc.*, 42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) ("Although Section 553 does not mention a *debtor's* right of setoff by its terms, the Bankruptcy Code implicitly recognizes the use of offset by a debtor as a 'defense' which the debtor may assert under Section [558] of the Code.") (emphasis in original); 5 COLLIER ON BANKRUPTCY ¶ 558.01 n.7. Nonetheless, section 558 contemplates defenses available under non-bankruptcy law, which the Amended Plan also preserves.

19 In *In re UTEX Communications Corp.*, 457 B.R. 549 (Bankr. W.D. Tex. 2011), the court denied an offset against administrative expenses on procedural grounds, holding that "[a]n objection to claim is the improper outlet for raising a claim of set off." *Id.* at 567. Rule 3007(b) directs that objections to the allowance of a claim may not include a demand for relief of a kind specified in Rule 7001. FED. R. BANKR. P. 3007(b). Rules 7001(1) and 7003, in turn, direct that "a proceeding to recover money or property" must be asserted by an adversary proceeding commenced by filing a complaint. FED. R. BANKR. P. 7001(1), 7003. However, pursuant to Rule 9014, a court may deem a contested matter to be an adversary proceeding at any state in a particular matter. *See* FED. R. BANKR. P. 9014(c); *id.* advisory committee's note.

*E. Richfield May Recover Some of Its Requested*
*Attorneys' Fees as Administrative Expenses*

28.     The parties dispute the availability of attorneys' fees as a matter of law, as well as the specific amounts requested.  As discussed below, the court concludes that at least some of the requested attorneys' fees are compensable as administrative expenses.

29.     Under Texas law, indemnity agreements do not generally apply to claims between the parties to an agreement.  *Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Mktg. Co. W.L.L.*, Civ. A. No. H-07-2684, 2008 WL 5114962, at *20 (S.D. Tex. Dec. 3, 2008); *Nat'l City Mortg. Co. v. Adams*, 310 S.W.3d 139, 144 (Tex. App.—Fort Worth 2010, no pet.); *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 63 (Tex. App.—San Antonio 2005, pet. denied); *Wallerstein*, 8 S.W.3d at 780 (citing *Derr Const. Co. v. City of Hous.*, 846 S.W.2d 854, 858 (Tex. App.—Houston [14th Dist.] 1992, no writ).  Instead, an indemnity agreement "obligates the indemnitor to protect the indemnitee against claims brought by third parties."  *Kellogg Brown & Root Int'l*, 2008 WL 5114962, at *20 ("An indemnity provision generally does not apply to claims between the parties to the agreement but obligates the indemnitor to protect the indemnitee against claims brought by third parties.").  Thus, "[u]nlike a release, which suppresses a cause of action, an indemnity creates a potential cause of action between the indemnitee and the indemnitor."  *Wallerstein*, 8 S.W.3d at 779.

30.     Despite the general rule, parties may include specific language to "indemnify each other against claims they later assert against each other."  *Compare Kellogg Brown & Root Int'l*, 2008 WL 5114962, at *20 (holding that language in indemnity clause indemnifying "claims . . . by other persons" barred claim brought between parties to the agreement), *with Ganske v. Spence*, 129 S.W.3d 701, 708 (Tex. App.—Waco 2004, no pet.) (holding that an indemnity agreement identifying a claim for the "breach or falsity of any covenant or agreement made by"

one of the agreement's parties did not bar claim brought between parties to the agreement). Such language must be specific to overcome the general rule because "indemnity agreements are strictly construed in favor of the indemnitors . . . ." *Safeco Ins. Co. of Am. v. Gaubert*, 829 S.W.2d 274, 281 (Tex. App.—Dallas 1992, writ denied).

31.     Under section 25.10, Owner agrees to "indemnify, defend, and hold harmless [Richfield] . . . from and against any and all claims, liabilities, losses, damages, costs, and expenses of any kind or character, including without limitation court costs [and] reasonable attorneys' fees" so long as those claims were "arising from or related to the management, operation, or maintenance of the [Property]." *Id.* § 25.10; *supra* Findings of Fact ¶ 13. Likewise, section 25.12 limits payment of such costs to "legal proceedings that are instituted against the [Property, Richfield], or both related to the operation, management or maintenance of the [Property] . . . ." J.-Ex. 49 § 25.12; *supra* Findings of Fact ¶ 14.

32.     Both sections 25.10 and 25.11 of the Operating Agreement use language evincing an agreement to indemnify. *See, e.g.*, *Derr Const. Co.*, 846 S.W.2d at 859 ("Typical indemnity language is "indemnify, save, protect, save/hold harmless."). Section 25.12 does not include such language, but instead provides the payment mechanism for the indemnifications provided in sections 25.10 (Owner as indemnitor) and section 25.11 (Operator as indemnitor). Consistent with the authorities already discussed regarding contract construction, *see supra* Conclusions of Law ¶¶ 5–6, the court concludes that sections 25.10, 25.11, and 25.12 of the Operating Agreement must be construed together. As a result, section 25.12 does not create an independent obligation to indemnify for attorneys' fees. Instead, section 25.10 provides for situations where Owner would indemnify Richfield, and section 25.12 dictates that such costs "shall be charged as Operating Expenses or paid directly by Owner." *See* J.-Ex. 49 § 25.12.

33.     The extent to which Richfield's request for attorneys' fees qualifies under these sections as "related to the operation, management, or maintenance of the [Property]" or as disputes between Richfield, Debtor, and other third parties depends on the respective category of the fees.  The court's ability to determine the characteristics of each category and the respective fees are limited based on the evidence provided.[20]  Nonetheless, the court may dispose of Richfield's requests for certain fees that were identified specifically or certain categories of fees that do not qualify as administrative expenses as a matter of law.

34.     The court concludes that neither Debtor nor Richfield should be considered the "prevailing party" under section 40.1 of the Operating Agreement.  Accordingly, all requests for attorneys' fees by either party pursuant to that section are denied.

35.     Pursuant to section 40.2 of the Operating Agreement, each party bears its own costs related to "the negotiation, preparation, execution, and carrying into effect" of the Operating Agreement.  Accordingly, Richfield is not entitled to compensation fees incurred for negotiating operating agreements with Debtor, Dougherty, and 1701 Commerce Acquisition. *See* Tr. 7/15 Hr'g at 57:25–59:6.  Likewise, fees incurred attempting to enter into an operating agreement with, or obtain a liquor license for, 1701 Commerce Acquisitions do not qualify as administrative expenses because such expenses did not arise from a transaction with Debtor.  *See In re TransAm. Natural Gas Corp.*, 978 F.2d at 1417; Tr. 7/15 Hr'g at 45:14–22, 50:13–18, 52:6–19.

36.     Debtor has already reimbursed Richfield for a portion of the fees included in the Second Request that, in Debtor's estimation, appear to be those fees Richfield incurred as part of

---

20     For instance, Debtor argues that the indemnity language in section 25.10 limits relief to claims brought against Operator by third parties and does not include claims between the parties.  *Debtor Pre-Hr'g Br.*, docket no. 662, at 22–24.  However, the evidence provided makes it difficult for the court to determine whether Richfield's itemized charges concern claims between Debtor and Richfield or against third parties.

third-parties' litigation against Debtor during the Case. D.-Exs. 42–43; Tr. 7/15 Hr'g at 63:11–64:2. These fees correspond with the blue color-coding in Debtor Exhibit 41, and Debtor Exhibit 43 provides an itemized break-down of these fees. D.-Exs. 41, 43; Tr. 7/15 Hr'g at 62:22–63:14. The court agrees with Debtor's estimation and holds that the $9,347 of fees identified in Debtor Exhibit 43 is compensable as an administrative expense.

37.     Aside from those categories of fees already identified, the court notes the difficulty in determining what amount of the remaining attorneys' fees Richfield may recover as administrative expenses.     The evidence presented creates an elaborate scavenger hunt complicated by hand-written annotations and color-coded guideposts.     Moreover, the parties' characterizations of what expenses are compensable appear to be internally inconsistent.[21]   The court is left with a poorly calibrated compass and little indication of true north.

38.     Nonetheless, after further review of Richfield Exhibit 40 and Debtor Exhibit 41, the court concludes that the remaining attorneys' fees that are payable as administrative expenses total no more than $15,364.   Accordingly, the court holds that $15,364 of the requested attorneys' fees, in addition to the $9,347 Debtor identifies in Debtor Exhibit 43 for a total of $24,711, will be GRANTED as administrative expenses.

---

[21]     For instance, Debtor repeatedly references a credit memo Richfield generated to refund Debtor for what Debtor characterizes as "erroneously withdrawn funds in payment of Richfield's legal fees for miscellaneous services rendered by its counsel during the case." *Debtor's Pre-Hr'g Br.*, docket no. 662, at 24 & n.104; *Debtor's Proposed Findings and Conclusions*, docket no. 673, ¶ 42 & n.62.  The same bill for attorneys' fees referenced in the credit memo appears in the unredacted versions of Richfield's bills.  *Compare* D.-Ex. 35 at 1807–09, *with* R.-Ex. 40 at 31–33, *and* D.-Ex. 41 at 31–33.  Yet, despite Debtor's blanket disapproval of these fees in other pleadings, Debtor marked some fees subject to the credit memo as "Reimbursable" (*i.e.*, color-coded blue).  D.-Ex. 41 at 32.

### III. CONCLUSION

For the foregoing reasons, the court holds that (1) Richfield's request for the Liquidated Damages Amount of $184,561.50 is DENIED; (2) Richfield's request for the Termination Fee of $92,280.75 is GRANTED; (3) Richfield's award of administrative expenses must be offset by the unpaid Rebate amount of $116,991.20; and (4) Richfield's request for its attorneys' fees to be paid as administrative expense is GRANTED IN PART in the amount of $24,711 and DENIED IN PART as to the remaining fees. Debtor's counsel is directed to upload an order consistent with these findings of fact and conclusions of law.

**### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###**